EEOC v. Karenkim, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term, 2012

(Argued: August 23, 2012       Decided: October 19, 2012)

————————————————————————————————

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff-Appellant*,

—v.—

KARENKIM, INC.,
d/b/a Paul's Big M, d/b/a Paul's Big M Grocery,

*Defendant-Appellee*.

Docket No. 11-3309-cv

————————————————————————————————

B e f o r e : KATZMANN, WESLEY and LYNCH, *Circuit Judges*.

————————————

Plaintiff-Appellant Equal Employment Opportunity Commission ("EEOC") appeals from a post-judgment order entered on June 17, 2011 by the United States District Court for the Northern District of New York (Mordue, *C.J.*), which denied the EEOC's request for injunctive relief against Defendant-Appellee KarenKim, Inc. following a jury verdict finding KarenKim liable for sexual harassment and fostering a sexually hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* and New York State law. We hold that, in the circumstances of this case, the district court abused its discretion in denying any injunctive relief to the EEOC. At minimum, the district court was obliged to craft injunctive relief sufficient to prevent further violations of Title VII by the individual who directly perpetrated the egregious sexual harassment at issue in this case. Accordingly, the post-judgment order of the district court is **VACATED** and the case is **REMANDED** for further proceedings consistent with this Opinion.

Counsel for Plaintiff-Appellant:     BARBARA L. SLOAN, Attorney (Daniel T. Vail, Acting Assistant General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, *on the brief*), *for* P. David Lopez, General Counsel, Equal Employment Opportunity Commission, Washington, D.C.

Counsel for Defendant-Appellee:     DAVID P. ANTONUCCI, Law Office of David P. Antonucci, Watertown, N.Y.

PER CURIAM:

This case requires us to determine whether a district court abuses its discretion where, in the face of egregious acts of sexual harassment perpetuated by a single employee, it declines to order injunctive relief directed toward ensuring that that individual is no longer in a position to continue his harassing conduct. We conclude that it does.

## BACKGROUND

After a two-week trial, pursuant to a Complaint brought by Plaintiff-Appellant the Equal Employment Opportunity Commission ("EEOC"), a jury returned a verdict finding that Defendant-Appellee KarenKim, Inc. ("KarenKim"), a grocery store operating in Oswego, New York under the name Paul's Big M Grocery, had: (1) subjected a class of female employees to a sexually hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and (2) sexually harassed the Plaintiffs-Intervenors Andrea Bradford, Judith Goodrich, and Deborah Haskins, in violation of Title VII and New York State law. The jury awarded both compensatory and punitive damages to a class of ten individuals who it found had been victimized by KarenKim and its former employee, Allen Manwaring.

2

The following facts were adduced at trial, and are undisputed for purposes of the instant appeal. KarenKim is owned and managed by Karen Connors. In January 2001, KarenKim hired Allen Manwaring, who was then in his mid-30s, as Store Manager. Within months, he and Connors became "romantically involved." App. 1851. They have been engaged since 2006 and have a young son together. Manwaring is now in his mid-forties.

At trial, a number of current and former KarenKim employees testified that Manwaring repeatedly subjected them to both verbal and physical sexual harassment. The verbal harassment consisted mainly of sexual comments, questions, and innuendos. Emily Anderson, for example, testified that soon after she began working at KarenKim, when she was 16 years old, Manwaring began commenting on her appearance in sexually explicit terms. She also stated that Manwaring had insinuated that he would like to engage in a sexual relationship with Anderson and her mother. Similarly, Anna Miller, also age 16 when she started at KarenKim, testified that Manwaring would make comments of a sexual nature to her on a daily basis and compliment parts of her body. He also told her that if he were her boyfriend, he would never "let [her] out of his sheets" and commented that, "if he was 10 years younger, he would be on top of [her]." *Id.* at 1013-14, 1026. In another example, Andrea Bradford testified that Manwaring had discussed his sexual frustrations with her, and then commented that one day he would "pick [her] up" and engage in sexual relations with her. *Id.* at 885.

As to physical harassment, several witnesses testified that Manwaring would regularly touch, massage, and engage in other inappropriate conduct with teenaged female KarenKim employees. For example, Anna Miller said that when she was working alone in the front office, Manwaring would come in and deliberately brush her breast with his arms, come up behind her and

3

put his crotch against her buttocks and whisper in her ear or breathe on her neck, put his hands on her hips and squeeze, rub her shoulders, put his arm around her and hug, or walk by so closely that his hand would brush her buttocks. Similarly, Emily Anderson testified that Manwaring touched her almost every time he found her alone by massaging her shoulders, touching the back of her hair, and rubbing her thigh. As another example, Abigail Murray said that when Manwaring spoke to her, he would often stand "really close," put his hand on her shoulder, and "lean in," invading her "personal space bubble" and causing her to "cringe away." *Id.* at 393. Rachel Johnson echoed this testimony, stating that, when speaking to her, Manwaring would stand very close with his arm bent and a hand on her shoulder, and pull her closer until they were face to face. Similarly, Amanda Cole testified that Manwaring would "squeeze" in behind her in the tiny alcove by the cash register and "press" against her, "body to body almost." *Id.* at 621-22.

Manwaring's conduct did not go unnoticed. Former KarenKim Manager Carol Akers asserted that "[p]retty often, . . . maybe at least twice a week," she saw Manwaring "[g]iving [female employees] hugs, . . . standing behind them, giving them a back rub, putting his hands on their shoulders." *Id.* at 224. Amanda Cole testified that she often discussed Manwaring's conduct with other employees, stating that it was "chattered about on a daily regular basis." *Id.* at 632. She stopped participating in such conversations, however, after Manwaring called her into the stock room and confronted her about "rumors that he heard that [she] was spreading . . . about him sexually harassing employees," adding that she was "lucky that he didn't fire [her] right then and there." *Id.* at 637-38. Afraid she would be terminated from her first job, she started crying. Manwaring then hugged her, kissed her on the cheek, and whispered in her ear that "if he was gonna sexually harass anybody, it would be [her]." *Id.* at 638.

4

KarenKim had no anti-harassment policy until mid-2007, and did not have a formal complaint procedure until after the trial in this action. Nevertheless, several KarenKim employees complained to their supervisors about Manwaring's conduct. The first to do so, Angela Hamlin, complained to her manager, Carol Akers, that Manwaring had touched her inappropriately and had asked her questions of a sexual nature, such as how much she charged for sexual acts. Shortly thereafter, Hamlin was terminated for absenteeism. Several other witnesses testified that they had complained about Manwaring's conduct. For example, Emily Anderson testified that she complained to KarenKim Manager Marlene Davis because Manwaring had told another employee that he wanted to engage in sexual relations with Anderson. However, according to Anderson, Davis had hurried away and did not follow-up on the conversation as she had promised. In addition, Akers testified that Anna Miller complained to her and Davis that Manwaring had told Miller that she was "so pretty and young" that anyone would want to "sleep with" her. *Id.* at 244. In response, Akers and Davis confronted Manwaring, telling him that he probably "just didn't realize . . . that certain things are inappropriate." *Id.* at 245.

Akers testified that she had reported complaints of sexual harassment to Connors. In addition, Lorraine Warren said that she complained to Connors at her parents' urging after Manwaring pulled up her underwear and made sexual comments as she bent over to stock the deli. Thereafter, Warren met with Connors and Manwaring, at which point Manwaring accused Warren of making up the story. Warren was then fired. Bradford also testified that she and several other employees approached Connors in her office and described specific incidents in which Manwaring had engaged in sexual harassment. Connor responded by crying and initially appeared to believe Bradford and her companions, but later decided that the complaints were unfounded. Similarly,

Anna Miller testified that, when she quit working for KarenKim, she left a letter for Connors detailing Manwaring's sexual harassment of her over several years. Connors testified that, while she recalled the letter, she believed Miller had been lying about the harassment.

At trial, Connors testified that she could only recall two complaints of possible harassment involving Manwaring, and that she felt both complaints were handled appropriately. The first came from Kelsey Rose, then still in high school, who complained that Manwaring suddenly stuck his tongue in her mouth as she was talking on the phone one day, and then walked away "with a smirk on his face." *Id.* at 1133-34. Crying "[h]ysterically," *id.* at 1134-35, she called her friend's mother to complain and the police arrived soon thereafter. Rose gave the police a statement implicating Manwaring and never returned to work at KarenKim. Manwaring pled guilty to second degree harassment, but testified that "in [his] heart [he] always felt it was an accidental joking incident." *Id.* at 1663. Another employee testified that Manwaring told others that Rose was lying about the incident. *Id.* at 1178.

In deposition testimony heard by the jury, Connors stated that she did not believe Manwaring had done anything wrong in regard to this incident, and accepted his explanation that he had "f[allen] into" Rose. *Id.* at 1957. Nevertheless, she suspended Manwaring for 30 days with pay and warned him that he would be fired if she received another harassment complaint. However, Manwaring went into the store a few times during the suspension, without consequence. Following the Rose incident, KarenKim drafted an employee handbook which contains a sexual-harassment policy and directs employees to report instances of sexual harassment to Connors. Employees are required to take a copy of the handbook home, sign a form acknowledging that they have read it, and return it with the signed form to KarenKim.

6

The second incident involved Kim Davis, who complained several times to her night manager that Manwaring made comments of a sexual nature to her, expressed his desire to have sexual relations with her, and touched her inappropriately on the buttocks. She testified that she did not initially complain to Connors directly, however, because Connors had shown her Anna Miller's resignation letter and stated that Miller's comments about Manwaring were all lies. In May 2010, while this lawsuit was pending, Davis had a fight with her boyfriend. Seeing her upset, Manwaring said, "[w]hy don't you tell [your boyfriend] that I've been wanting to [have sex with] you for a year and a half now[?]" *Id.* at 1179. Thereafter, Davis told Connors about the incident and her past experiences with Manwaring, and told Connors that she was quitting. In response, Davis testified, Connors cried. Thereafter, Connors called Davis and told her she had fired Manwaring and asked her to return to work at the store. Davis agreed.

Davis further testified that Connors asked her, in light of the pending lawsuit, "to lie and tell everybody [Manwaring] was farming," instead of saying that he had been fired for sexually harassing her. *Id.* at 1188. In addition, Connors asked Davis not to seek a protective order against Manwaring, explaining that "if [Davis] were to come forward, [Connors] would lose everything and she would lose the store." *Id.* Davis agreed. The first time the EEOC learned that Manwaring had been fired for sexual harassment was at Connors' deposition, three weeks before trial.

In early November 2010, at Connors' request, Davis wrote a statement for the instant lawsuit in which she asserted that "[t]he only harassment I have received is from the EEOC" because "[the EEOC's trial attorney] will not stop trying to contact me." *Id.* at 1195. Soon after Davis prepared her statement, Manwaring started reappearing around the store. Davis saw him only once, but her supervisor told her he had been there several other times and conveyed the

7

message that "Allen says hi." *Id.* at 1193. In late November, Davis was fired for smoking marijuana on her break. She agreed to testify on behalf of the EEOC in this lawsuit, she stated, because she no longer had anything to lose and, moreover, "wanted to help put a stop [to Manwaring] doing this in the future to people." *Id.* at 1196. Connors denied telling Davis to lie or dictating the language in Davis' statement. However, she admitted giving Davis' statement to her lawyer even though she knew that Davis had in fact been harassed at work and that the lawyer would forward the statement to the EEOC.

Based on the foregoing, the jury returned a verdict for the EEOC and the Plaintiff-Intervenors, finding that KarenKim and Manwaring were liable for maintaining a "sexually hostile work environment" with "malice or reckless indifference" to the rights of young female KarenKim employees. *Id.* at 8, 16. In so finding, the jury implicitly rejected KarenKim's arguments that it took reasonable steps to stop and prevent sexual harassment, and that the employees failed to complain about any harassment that occurred. *See id.* at 2201-2205 (jury instructions on the two defenses). The jury awarded the ten members of the class a total of $10,080 in compensatory damages and $1,250,000 in punitive damages.[1]

Following trial, the EEOC moved to alter and amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure so as to impose broad injunctive relief against KarenKim. In particular, the EEOC contended that injunctive relief was necessary because KarenKim has not adopted adequate measures to ensure that harassment of the kind at issue in this action does not recur. In support, the EEOC noted that Connors and Manwaring remained in a romantic

---

[1]The district court subsequently ordered that the damages awarded on the Title VII claims to each member of the class be reduced to the applicable statutory cap of $50,000. *See* 42 U.S.C. § 1981a(b). The damages actually awarded to Plaintiff-Intervenors were not reduced; the amount awarded over $50,000 was reallocated to the state law claims.

relationship; that, following the jury verdict, Manwaring continued to publicly deny he had engaged in any sexual harassment; and that Manwaring continued to be a presence at the store in his new capacity as a produce contractor for KarenKim. The EEOC also recounted an incident that occurred approximately six weeks after the trial in which Lorraine Warren, a claimant in this action, and her husband attempted to enter Paul's Big M, but were ordered to "leave immediately" and told they were "no longer allowed in the store." *Id.* at 81-82. In addition, the EEOC noted that, absent an injunction, there is no legal bar to KarenKim re-hiring Manwaring.

Further, while KarenKim adopted policies requiring its employees to undergo anti-harassment training and instituted a complaint procedure by which its employees can report instances of sexual harassment, the EEOC contended that both of these measures are facially inadequate to prevent future violations of Title VII. Specifically, the EEOC noted that the complaint procedure requires employees to complain "within 30 days from the date which the Complainant first knew or reasonably should have known" of the unlawful "discriminatory act," and states that, except in "rare" circumstances, the company will act on only "formal"complaints, which must be in writing on a special form. *Id.* at 67-69. The EEOC also noted that the training course consists of a short online module, which can be completed in a few minutes by simply clicking rapidly through the pages and allows an individual to print out multiple completion certificates at once. *See id.* at 75-76.

Based on the foregoing, the EEOC requested that the district issue a wide-ranging injunction, lasting for ten years, which would order, among other things: (a) that KarenKim may not create or maintain a hostile work environment or retaliate against individuals for engaging in Title VII protected activity; (b) that KarenKim may not employ or otherwise compensate

Manwaring in any way, except for purchasing produce from him; (c) that Karen Kim must bar Manwaring from entering the grocery store building; (d) that KarenKim must produce and distribute copies of a notice indicating that Manwaring was barred from entering the building, along with copies of Manwaring's photograph; (e) that KarenKim must pay for an independent monitor to continually review KarenKim's employment practices and investigate possible instances of sexual harassment; (f) that KarenKim must amend its nondiscrimination policy and complaint procedure in a variety ways, and prominently post the policy; (g) that KarenKim must conduct an annual training session on sexual harassment for its employees; and (h) that the EEOC is authorized to monitor KarenKim's compliance with the injunction, and that KarenKim must cooperate in bi-annual EEOC compliance reviews. KarenKim did not object to the proposed injunction's provision prohibiting it from employing or compensating Manwaring, but contended that the injunction's other provisions were unnecessary and overly burdensome.

By Order dated June 17, 2011, the district court denied the EEOC's request for injunctive relief in its entirety, concluding that all the requested relief was unnecessary and overly burdensome. As to the burdensomeness of the relief, the court noted that the proposed injunction would last ten years and "requires the defendant to alter drastically its employment practices and hire an independent monitor whom, together with the EEOC, will review and critique any present or future employment practices with respect to sexual harassment." *Equal Emp't Opportunity Comm'n v. KarenKim, Inc.*, No. 08-CV-1019(NAM), 2011 WL 2462297, at \*6 (N.D.N.Y. June 17, 2011). As to the necessity of the relief, the district court stated that the evidentiary record:

> . . . suggests that the discriminatory and unlawful actions in this case were isolated instances involving a manager who is no longer employed by the company and employees who are no longer employed by the company, occurring during a period when the company did not have clearly established anti-harassment policies . . . .

10

> Given the existence of an anti-harassment policy . . . and the company's now keen awareness of the issue, the Court is hard-pressed to imagine that should complaints by employees concerning sexual harassment or employment discrimination of any other kind arise in the future, . . . KarenKim will not take them seriously.

*Id.* at *7-8. Accordingly, the court concluded that there is no cognizable danger that KarenKim will engage in recurrent violations of Title VII, and so the imposition of injunctive relief is not warranted in the circumstances of this case.[2] *Id*. at *10. In so concluding, the court rejected as "specious" the EEOC's arguments that the continuation of the personal relationship between Conners and Manwaring could result in the resurrection of the hostile work environment or allow Manwaring to engage in further sexual harassment of KarenKim employees. *Id.* at *8-9.

The EEOC appealed.

## DISCUSSION

A district court's decision to grant or deny injunctive relief is reviewed for abuse of discretion. *Malarkey v. Texaco Inc.*, 983 F.2d 1204, 1214 (2d Cir. 1993). "A district court abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2)

---

[2] The district court concluded that the EEOC, as the moving party, bore the burden of demonstrating the appropriateness of injunctive relief. *See KarenKim*, 2011 WL 2462297, at *7. We recognize that several of our sister Circuits have held that, where violations of Title VII have been proven, injunctive relief is presumptively appropriate and the defendant-employer therefore bears the burden of showing that it is not. *See, e.g.*, *Equal Emp't Opportunity Comm'n v. Rogers Bros., Inc.*, 470 F.2d 965, 966–67 (5th Cir. 1972) (per curiam). However, because we conclude that the district court has abused its discretion in denying all injunctive relief to the EEOC regardless of which party bore the initial burden of proof, we need not address here whether the district court was correct in placing that burden on the EEOC. The EEOC did not ask this Court to shift the burden to the defendant-employer to show that injunctive relief is not appropriate. *See* Appellant's Br. at 43 n.10. Although counsel for the EEOC stated at oral argument that it "would be great" if the Court did so, she contended that "it doesn't matter" in the circumstances of this case because the EEOC had presented ample evidence to prevail "regardless of which party has the burden of proof." Transcript of Oral Argument at 9 (argued Aug. 23, 2012). We agree.

11

bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions." *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (internal quotation marks omitted).

Generally, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Natural Res. Defense Council Inc.*, 555 U.S. 7, 32 (2008). In seeking an injunction, "the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation . . . ." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Equal Emp't Opportunity Comm'n v. Everdry Mktg. and Mgmt.*, 348 F. App'x 677, 679 (2d Cir. 2009) (summary order) (no abuse of discretion in denying injunctive relief where the entity that violated Title VII "no longer exists"). "The factors . . . [that] are pertinent in assessing the propriety of injunctive relief" are "the balance of equities and consideration of the public interest." *Winter*, 555 U.S. at 32. "[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct." *W.T. Grant*, 345 U.S. at 633; *see also Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 230 (2d Cir. 2006) ("Under Title VII, equitable relief is not incidental to monetary relief."). In determining whether to impose an injunction where a defendant has ceased the offending conduct, courts may consider "the bona fides of the [defendant's] expressed intent to comply" with the law, "the effectiveness of the discontinuance," and "the character of the past violations." *W.T. Grant*, 345 U.S. at 633; *see also Malarkey*, 983 F.2d at 1215 (noting the relevance of whether past violations were "isolated" or "widespread").

12

Under Title VII, "[i]f the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate." 42 U.S.C. § 2000e-5(g)(1). Accordingly, "[o]nce a violation of Title VII has been established, the district court has broad, albeit not unlimited, power to fashion the relief it believes appropriate." *Bridgeport Guardians Inc. v. City of Bridgeport*, 933 F.2d 1140, 1149 (2d Cir. 1991). "The bounds of the court's discretion are set by the purposes of Title VII, which are to prevent discrimination and achieve equal employment opportunity in the future . . . ." *Berkman v. City of New York*, 705 F.2d 584, 594 (2d Cir. 1983).

Applying the foregoing standards, we conclude that the district court abused its discretion insofar as it denied the EEOC's request for injunctive relief specifically directed toward ensuring that Manwaring is no longer in a position to sexually harass KarenKim employees. Although we recognize that, in the ordinary case, terminating a lone sexual harasser may very well be sufficient to eliminate the "cognizable danger" that a defendant-employer will engage in "recurrent violation[s]" of Title VII, *W.T. Grant*, 345 U.S. at 633, this is not an ordinary case. Notably, in this case, the lone harasser, Manwaring, was not just one supervisory employee among many, but was the Store Manager, with authority over all the defendant-employer's employees. Moreover, he was and remains in a longstanding romantic relationship with Connors, the owner and highest officer of the defendant-employer. Moreover, the record makes evident that this romantic relationship between Connors and Manwaring was the primary reason why Manwaring's harassment went unchecked for years, subjecting an entire class of young female KarenKim employees to a sexually hostile working environment. Absent an injunction, nothing prevents Connors from once again

13

hiring Manwaring as an employee. In addition, even if Manwaring is not re-employed at KarenKim, Manwaring's status as Connors's fiancé, as well as his relationships with other current KarenKim employees, renders it likely that he will remain a presence at the store. *See id.* ("[T]he effectiveness of the discontinuance" of the violating conduct is a relevant factor in determining the appropriateness of injunctive relief.). Finally, Connors's past refusal to adequately respond to multiple credible complaints about Manwaring's conduct suggests that, so long as Manwaring remains in a romantic relationship with KarenKim's owner and highest officer, KarenKim will not take adequate remedial measures in response to any future harassment on the part of Manwaring. *See id.* (The "character of the past violations" is a factor in determining the appropriateness of injunctive relief.).

While it is not our role to fashion the specific measures necessary to prevent the recurrence of Manwaring's misconduct and the resulting hostile work environment at KarenKim, we conclude that, at minimum, the district court exceeded the scope of its discretion in declining to order (a) that KarenKim is prohibited from directly employing Manwaring in the future, and (b) that KarenKim is prohibited from permitting Manwaring to enter its premises. To be sure, the district court was well within its discretion in concluding that some of the EEOC's requested relief -- such as requiring KarenKim to distribute wallet-sized photographs of Manwaring to its employees, or to hire and pay for an independent monitor to continually review KarenKim's employment practices and investigate possible instances of sexual harassment -- are overbroad and disproportionate to the scale of KarenKim's unlawful behavior. And, while we share the EEOC's concerns regarding the adequacy of KarenKim's newly-adopted policies requiring sexual harassment training and

14

instituting a complaint procedure,[3] we leave to the district court's sound discretion whether reformation of these policies is necessary to prevent recurrence of the misconduct in this case.

For the foregoing reasons, the post-judgment order of the district court denying EEOC's request for injunctive relief in its entirety is hereby **VACATED** and the case is **REMANDED** to the district court for further proceedings consistent with this Opinion.

---

[3] In particular, the adequacy of the complaint procedure is suspect in a number of respects. First of all, it directs employees to submit complaints to Connors, who has ignored complaints and retaliated against complainants in the past. Additionally, its use of technical language such as "discriminatory act" appears ill-suited to KarenKim's employee population, many of whom are still teenagers. *See Equal Emp't Opportunity Comm'n v. V & J Foods*, 507 F.3d 575, 578 (7th Cir. 2007) ("Knowing that it has many teenage employees, the company was obligated to suit its procedures to the understanding of the average teenager."). Moreover, we see no justification for requiring employees to submit written complaints "within 30 calendar days following the alleged discriminatory act," App. 68. *Compare* 42 U.S.C. § 2000e-5(e) (providing for a 300 day statutory window within which employees may generally file charges in federal court so long as they have also instituted proceedings with a state or local agency, and providing a 180 day window if no local charges have been filed); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011) (To trigger the Fair Labor Standards Act's anti-retaliation provision, "a complaint must be sufficiently clear and detailed" to put the company on notice of the challenged conduct. "This standard can be met . . . by oral complaints.").

KATZMANN, *Circuit Judge*, concurring:

I concur in the Court's judgment and agree with its reasoning. I write separately to add my views on a question the Court's opinion does not reach, namely, whether the Equal Opportunity Employment Commission ("EEOC") or the defendant-employer should bear the burden of proving that injunctive relief is appropriate in cases where the defendant-employer has already been adjudged liable for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII" or "the Act").

As the Court's opinion notes, the moving party ordinarily bears the burden of "satisfy[ing] the court that [injunctive] relief is needed." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Winter v. Natural Res. Defense Council Inc.*, 555 U.S. 7, 32 (2008) (noting that, generally, "[a]n injunction is a matter of equitable discretion"). However, this Court has also recognized that, in enacting Title VII, Congress explicitly "aimed to give courts broad discretion, in the exercise of their equitable powers, to fashion the most complete relief possible for victims of discrimination." *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1133 (2d Cir. 1989); *see also* 42 U.S.C. § 2000e-5(g)(1) ("If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate.").

The Supreme Court has construed section 2000e-5(g)(1) of Title VII as "not merely [granting district courts with] the power" to issue injunctive relief to remedy violations of Title VII, but imposing on them "the *duty* to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody*, 422 U.S 405, 418 (1975) (emphasis added). We have echoed this

interpretation of the Act, holding that, upon a finding of "employment discrimination on the basis of race, color, religion, sex, or national origin, . . . the responsibility of a court . . . is to fashion equitable relief to make the claimant whole." *Nat'l Labor Relations Bd. v. Thalbo Corp.*, 171 F.3d 102, 110 (2d Cir. 1999) (internal quotation marks and citations omitted); *see also Equal Emp't Opportunity Comm'n v. Local 628*, 565 F.2d 31, 33 (2d Cir. 1977) (affirming a district court's ordering of equitable relief under Title VII, and stating that "[h]aving found a violation of the Act, the district court was not only within its power but under an obligation to fashion a remedy for the violation."); *Equal Emp't Opportunity Comm'n v. Joint Apprenticeship Comm. of Joint Indus.*, 186 F.3d 110, 116 (2d Cir. 1998) ("[W]hen a plaintiff establishes a defendant's liability under Title VII, there is no discretion to deny injunctive relief completely." (citing *United States v. Gregory*, 871 F.2d 1239, 1246 (4th Cir. 1989)).

Courts of Appeals in several of our sister Circuits have interpreted the Supreme Court's guidance that courts have a "duty" to use their equitable powers to remedy violations of Title VII to mean that, once a violation of Title VII is proven, injunctive relief is presumptively appropriate and the defendant-employer therefore bears the burden of establishing otherwise. *See, e.g.*, *Equal Emp't Opportunity Comm'n v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544-45 (9th Cir. 1987) (instructing that, on remand, "[i]f the EEOC proves its case, and [the defendant-employer] fails to prove the violation will likely not recur, the EEOC will be entitled to an injunction."); *Equal Emp't Opportunity Comm'n v. Rogers Bros., Inc.*, 470 F.2d 965, 966–67 (5th Cir. 1972) (per curiam) (upon finding of discrimination in a lawsuit brought by either the EEOC or a private litigant, "injunctive relief is mandatory unless the District Court finds on the basis of clear and convincing proof that there exists no reasonable probability of

2

further noncompliance," and specifying further that "[t]he burden of negating that probability lies with the defendants" (cited in *Equal Emp't Opportunity Comm'n v. Service Temps, Inc.*, 679 F.3d 323, 338 (5th Cir. 2012) (holding that because injunctive relief is presumptively appropriate once a violation of Title VII is proven, "we need not address [the defendant's argument] that there was an 'absence of any evidence' to support the EEOC's request for injunctive relief"); *see also, e.g.*, *Equal Emp't Opportunity Comm'n v. Harris Chernin, Inc.*, 10 F.3d 1286, 1292 (7th Cir. 1993) (suggesting that the EEOC is ordinarily entitled to injunctive relief where it proves a violation of Title VII and the defendant-employer fails to prove that the violation is not likely to recur); *Equal Emp't Opportunity Comm'n v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1253-54 (11th Cir. 1997) (favorably citing *Harris Chernin*, 10 F.3d 1286, and "conclud[ing] that the district court abused its discretion in turning down all equitable relief out of hand" and "remand[ing] the case to the district court so that it can grant the requested relief" unless it "finds persuasive reasons to deny particular items of relief").

I agree with the Court's conclusion that, in order to resolve the instant appeal, we need not determine whether injunctive relief is presumptively available once a violation of Title VII is established. Under any standard, the district court abused its discretion in denying all the EEOC's requested injunctive relief against Defendant-Appellee KarenKim, Inc. However, I agree with my colleagues in the Fifth, Seventh, Ninth, and Eleventh Circuits that the most natural way to practically effectuate the Supreme Court's guidance that Title VII grants courts with "not merely the power" but "the duty" to remedy violations of the Act through injunctive relief would be to shift the burden of proving the appropriateness of such relief onto the defendant-employer once liability under the Act is established. In other words, I would hold

3

that, after a finding of liability, the defendant-employer bears the burden of establishing that there is no "cognizable danger" that it will engage in "recurrent violation[s]" of the Act. *W.T. Grant*, 345 U.S. at 633. It is not my view, of course, that the EEOC or a private plaintiff should be entitled to any injunctive relief it proposes. Rather, I believe that, once liability under Title VII is established, the defendant-employer should first bear the burden of proving that equitable relief is not necessary to prevent the unlawful conduct from recurring; if the defendant-employer cannot meet its burden, then I believe a district court should be charged with determining, in its discretion, which specific forms of injunctive relief are necessary to prevent reoccurrence of the misconduct.