07-4143-cv
The Ret. Plan of the UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: January 16, 2009                    Decided: December 21, 2010)

Docket No. 07-4143-cv

_____

THE RETIREMENT PLAN OF THE UNITE HERE NATIONAL RETIREMENT FUND, and NOEL
BEASLEY, HAROLD BOCK, JAMES BRUBAKER, MARK FISHMAN, MARK FLEISCHMAN, RICHARD
GILBERT, JOHN GILLIS, JIM HANESCHLAGER, ADAM HARRIS, CHRISTINE KERBER, STEVEN
MASKET, DESMOND MASSEY, DAVID MELMAN, HOMI PATEL, WARREN PEPICELLI, JEANNE
PRATT, BRUCE RAYNOR, HARRIS RAYNOR, EDGAR ROMNEY, RICHARD RUMLET, and LYNN
TALBOTT, as Trustees of the UNITE HERE National Retirement Fund,

*Plaintiffs-Appellees*,

— v.—

KOMBASSAN HOLDING A.S.,

*Defendant-Appellant*.

_____

B e f o r e :

JACOBS, *Chief Judge*, KEARSE, and HALL, *Circuit Judges*.

_____

Kombassan Holding A.S. ("Kombassan") appeals from a judgment of the United States

District Court for the Southern District of New York (Rakoff, *J.*) holding it liable to the

Retirement Plan of the UNITE HERE National Retirement Fund and its trustees (the "Plan") for

withdrawal liability incurred by the entity Hit or Miss ("HOM") pursuant to sections 502(a)(3)

and 4301(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), codified at, 29 U.S.C. §§ 1132(a)(3), 1451(a), in a total amount, including prejudgment interest, exceeding one million dollars. Although Kombassan assigned its HOM shares to four Turkish corporations in order to avoid a Turkish law limiting overseas investments, because it continued to exercise complete control over HOM, we hold that Kombassan was an alter ego of HOM and is, therefore, responsible for its withdrawal liability.

AFFIRMED.

————————————

HARLAN M. LAZARUS, Lazarus & Lazarus, P.C., New York, New York, *for Defendant-Appellant.*

RONALD E. RICHMAN, (Scott A. Gold and Max Garfield, *on the brief*), Schulte Roth & Zabel LLP, New York, New York, *for Plaintiffs-Appellees.*

————————————

HALL, *Circuit Judge*:

Kombassan Holding A.S. ("Kombassan") appeals from a judgment of the United States District Court for the Southern District of New York (Rakoff, *J.*) holding it liable to the Retirement Plan of the UNITE HERE National Retirement Fund and its trustees (the "Plan") for withdrawal liability incurred by the entity Hit or Miss ("HOM") pursuant to sections 502(a)(3) and 4301(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), codified at, 29 U.S.C. §§ 1132(a)(3), 1451(a), in the amount of $668,929.00 plus prejudgment interest in the amount of $407,431.83, for a total of $1,076,360.83. Although Kombassan assigned its HOM shares to four Turkish corporations in order to avoid a Turkish law limiting overseas

investments, because it continued to exercise complete control over HOM, we hold that Kombassan was, in the circumstances presented here, an alter ego of HOM and is, therefore, responsible for its withdrawal liability. The judgment of the district court is AFFIRMED.

## I.    Background

ERISA was enacted to protect the interests of employee retirement benefit plan participants and their beneficiaries. *See* 29 U.S.C. § 1001b. One aim is to provide for a "sound termination insurance system" that ensures participants and beneficiaries will receive their full benefits even if, for example, their employer ceases operations. *Id.* When an employer "permanently ceases all covered operations under the plan," i.e., a "complete withdrawal," an obligation called "withdrawal liability" may be imposed on that employer. *Id.* §§ 1381(a), 1383(a). In that event, the plan sponsor determines the amount of the employer's withdrawal liability, notifies that employer of the amount owed, and collects the amount of the withdrawal liability from the employer. *Id.* § 1382. Under the principles of the common control doctrine, "all businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another." *Corbett v. MacDonald Moving Srvcs., Inc.*, 124 F.3d 82, 86 (2d Cir. 1997) (citing 29 U.S.C. § 1301(b)(1), 26 C.F.R. §§ 1.414(c)-1 through 1.414(c)-5).

In November 1998, Kombassan, a Turkish corporation, entered into a stock purchase agreement with HOM, a women's clothing retailer based in Massachusetts, to acquire 100% of HOM. Article 6.6 of the stock purchase agreement provided that Kombassan "may assign all or part of this Agreement to one or more of its affiliates or subsidiaries, including Acar Hydraulic Machines Ind. Inc., Kongaz Petroleum Ind. Inc., Koveka Textile Ind. Inc. and Makas Marble &

Mining Ind. Inc., without [prior written] consent; provided however that such assignment shall not relieve [Kombassan] of any obligation or liability hereunder." At the time of closing, Kombassan assigned the stock purchase agreement to the four Turkish corporations (the "assignees") listed in Article 6.6 as follows: 10% to Acar Hydraulic Machines Ind. Inc., 40% to Kongaz Petroleum Ind. Inc., 40% to Koveka Textile Ind. Inc., and 10% to Makas Marble & Mining Ind. Inc. Hasim Bayram, the chairman of Kombassan, signed the assignment agreement five times, once on behalf of Kombassan and four times as chairman of each of the four assignees. The purpose of the stock assignment was to circumvent Turkish law, which prohibited Turkish companies from investing more than $5 million outside Turkey without the permission of the Turkish government. The four original assignees were all pre-existing companies involved in industries separate from retail fashion. Although Bayram served as chairman of all these assignees, each corporation had separate offices, separate employees, and separate bank accounts. Kombassan was not a majority shareholder in most of the companies that were assignees during the relevant period.

Early in 2000, Bayram hired Donna Moore as HOM's president. Moore testified that during her tenure as president of HOM she communicated with and reported to Bayram on a weekly basis. Moore testified that she reported solely to Bayram and believed that Kombassan owned HOM because that is what Bayram led her to believe. According to Moore, Bayram made all the decisions for HOM in the name of Kombassan only. To the extent that she knew HOM had additional equity interest holders, Moore believed those companies were simply part of the Kombassan conglomerate. When HOM faced increasing financial difficulties during the spring of 2000, Moore turned to Bayram for assistance.

-4-

In June 2000, Moore wrote Bayram several letters, informing him that HOM needed cash infusions to pay its creditors, back rents, and expenses; she continued to seek such funds from Bayram in subsequent months.  That fall, Moore called Bayram to inform him that HOM did not have sufficient funds to make payroll and that, absent a cash infusion, HOM would likely have to seek bankruptcy protection.  Shortly thereafter, in November 2000, HOM filed a voluntary Chapter 11 petition thereby commencing bankruptcy proceedings.  The disclosure statement filed in connection with the HOM bankruptcy proceedings identified ten HOM equity interest holders, including Kombassan and the four initial assignees.

In January 2001, Kombassan agreed to provide $3 million in operating costs to HOM, which Kombassan identified as its "wholly owned indirect subsidiary."  Approximately two months later, however, HOM ceased its operations, thereby ending its ERISA obligation to continue making contributions to the Plan.  In filings made with the bankruptcy court during the course of the HOM bankruptcy proceeding, Kombassan made the following representations about its relationship to HOM:  (1) that it "controlled the board of directors of [HOM]," J.A. 504; (2) that "Kombassan holds directly or indirectly one hundred percent (100%) of the shares of the common stock of [HOM]," J.A. 508; and (3) that "Kombassan is a Turkish conglomerate engaged in the retail of, *inter alia*, women's clothing and holds directly or indirectly all of the issued and outstanding stock of [HOM]," J.A. 597.  In addition, at trial, Kombassan's general counsel testified that he agreed that HOM was wholly owned by Kombassan and a Kombassan sister company and agreed that Kombassan controlled the board of directors.  Finally, Kombassan held itself out to the public as the purchaser of HOM, stating on its website that the

purchase of HOM "marked an important step in Kombassan Holding's international strategy." J.A. 266.

After the Plan was notified that HOM had ceased operations and had "completely withdr[a]w[n]" from the Plan, the Plan informed Kombassan that it considered Kombassan to be responsible for HOM's withdrawal liability under ERISA's common control doctrine. The Plan determined that Kombassan owed $668,929 in withdrawal liability, all of which remains outstanding and is the subject of the instant suit.

After a three-day bench trial, the district court found that Kombassan was liable for the full $668,929 of withdrawal liability as the alter ego of the HOM equity interest holders and on the basis of judicial estoppel. The district court also ordered Kombassan to pay prejudgment interest in the amount of $407,431.83 and attorneys' fees, to be calculated following appeal.

Addressing the issue of judicial estoppel first, the district court held that Kombassan's myriad representations made to the bankruptcy court that HOM was its wholly owned indirect subsidiary were "binding on Kombassan Holding, because . . . the representations were in some manner relied upon or adopted by, in this case, the bankruptcy court." J.A. 270-71. Accordingly, applying those representations to the present case, the district court held that Kombassan was "directly liable" for HOM's withdrawal liability under ERISA's "single employer common control approach to withdrawal liability" set forth in ERISA section 4001(b)(1), codified at 29 U.S.C. § 1301(b)(1). J.A. 269, 272.

The district court next concluded that the alter ego approach to liability provided an alternative and independent basis for liability. J.A. 272. Noting that the Second Circuit applies the alter ego approach broadly in the ERISA context, the district court held that because

Kombassan and the assignees were under the common control of Bayram and because the assignment of HOM stock was done with a common purpose of avoiding problems for Kombassan under Turkish law, there was sufficient evidence that the assignees were alter egos of Kombassan so that Kombassan was the real entity in control of HOM, notwithstanding the assignment of stock. J.A. 272-75. The district court noted in addition that the representations made in the bankruptcy court further reinforced the application of the alter ego approach because they "conveyed unequivocally the message that so far as [HOM] was concerned, these various assignees were simply the handmaidens of Kombassan Holding and its chairperson." J.A. 275.

The court also determined that the Plan's calculation and assessment of withdrawal liability, Plaintiffs' Exhibit 16, and the testimony of Jeffrey Warbet, the Plan's administrator, established that the amount owed by Kombassan was $668,929.

## II. Discussion

On appeal, Kombassan disputes the district court's holding that it is obligated to pay the withdrawal liability under either the judicial estoppel or alter ego theory. Because we agree with the district court that Kombassan is liable for HOM's withdrawal liability under the alter ego approach, we do not reach the issue of judicial estoppel. We also hold that the district court properly admitted Exhibit 16, which set out the Plan's withdrawal liability calculation.

### A. Standard of Review

We defer to the district court's factual findings in support of its determination of alter ego status unless clearly erroneous, while we review its legal conclusions *de novo*. *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000). The

district court's evidentiary rulings are reviewed for abuse of discretion. *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000).

B.     Alter Ego Theory

On appeal, Kombassan argues that the alter ego doctrine is applicable only where it can be shown that the entities involved did not exist simultaneously and that the change in ownership or operations was accomplished in order to avoid the parent company's obligations, thereby making it a "sham transaction" or "disguised continuance." Kombassan, therefore, contends that the district court erred in applying the alter ego doctrine to hold Kombassan liable for HOM's withdrawal liability because the facts show that Kombassan and the assignees existed simultaneously and there were no facts to suggest that the stock assignment transfer was manufactured specifically to avoid Kombassan's obligations under the collective bargaining agreement. The Plan argues that the district court properly held Kombassan liable under an alter ego approach, noting that the alter ego theory can be applied broadly and flexibly in the ERISA context, and that there were sufficient facts to show commonality of control and business purpose, including the facts that: (1) Bayram was chairman of Kombassan and each of the initial four assignees, (2) Kombassan made multiple representations to the bankruptcy court that it controlled HOM and its board, and (3) Kombassan's general counsel testified that the purpose of the assignment was to circumvent Turkish law, which would otherwise have prevented Kombassan's ownership of HOM.

One effect of the alter ego doctrine is to "provide[] an analytical hook to bind a non-signatory to a collective bargaining agreement." *Truck Drivers Local Union No. 807, I.B.T. v. Reg'l Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991). Determining that an entity

-8-

is an alter ego "signifies that, for all relevant purposes, the non-signatory is legally equivalent to the signatory and is itself a party to the [collective bargaining agreement]." *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004). The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws "through a sham transaction or technical change in operations." *Newspaper Guild of N.Y., Local No. 3 of the Newspaper Guild, AFL-CIO v. NLRB*, 261 F.3d 291, 298 (2d Cir. 2001) (internal quotation marks omitted).

Although developed in the context of the National Labor Relations Act, the alter ego doctrine has relevance in the ERISA context as well. *Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 306 (1st Cir. 1998). "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits." *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 388 (2d Cir. 1989). To protect employee benefits, courts observe "a general federal policy of piercing the corporate veil when necessary." *N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 (2d Cir. 2005); *see also Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) ("Courts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined.").

"[T]he test of alter ego status is flexible," allowing courts to "weigh the circumstances of the individual case," while recognizing that the following factors are important: "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Goodman Piping Prods., Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir. 1984) (internal quotation marks removed). Although perhaps a "germane" or "sufficient

basis for imposing alter ego status," an "anti-union animus or an intent to evade union obligations" is not a *necessary* factor. *Id.* at 12 (internal quotation marks omitted). Accordingly, Kombassan's argument that it cannot be an alter ego because there were no facts establishing that the assignment was done with an anti-union animus or an intent to evade the obligations of the collective bargaining agreement is without merit.

Furthermore, Kombassan's argument that alter ego status cannot apply where the entities exist simultaneously is also incorrect. "Although the alter ego doctrine is primarily applied in situations involving successor companies, where the successor is merely a disguised continuance of the old employer, it also applies to situations where the companies are parallel companies." *Mass. Carpenters*, 139 F.3d at 307 (internal quotation marks and citations omitted). Parallel existence, therefore, is not an impediment to imposing alter ego status.

Applying the above analysis to the present case, the district court held that Kombassan was the alter ego of the HOM equity interest holders. We agree. Considering the important policy considerations for employing a flexible alter ego test in the ERISA context, and the interlocked relationship of the entities in this case, it is reasonable to treat Kombassan as the alter ego of the equity interest holders and hold it responsible for HOM's withdrawal liability. Significantly, Bayram was the chairman of Kombassan and each of the original four assignee corporations, which permitted him to effect the stock assignment merely by signing his name five times on the assignment agreement. This commonality of chairpersons permitted Bayram alone to control HOM as Kombassan despite the assignments. Indeed, as Moore's testimony indicated, Bayram led her to believe that Kombassan alone owned and controlled HOM. Moore was initially hired by Bayram, acting on behalf of Kombassan; HOM sought cash infusions solely

from Kombassan; the HOM board was composed solely of Kombassan personnel; and Moore met with Bayram at Kombassan's headquarters in Turkey. This characterization of Kombassan of being in actual, if not legal, control of HOM is confirmed by its statements made in filings submitted in connection with the HOM bankruptcy proceeding. For example, Kombassan repeatedly stated that it held, directly or indirectly, 100% of HOM's outstanding stock and was in control of the HOM board. Kombassan's general counsel testified at trial that HOM was wholly owned by Kombassan and a Kombassan sister company; he affirmed that Kombassan controlled the HOM board; and he explained that the true purpose of the stock assignment was to permit Kombassan to circumvent prohibitions on overseas investments under Turkish law while retaining control of HOM's day-to-day business operations. By assigning away its HOM stock, Kombassan created alter egos through which it could continue to exercise control and management over HOM after the assignment and without running afoul of Turkish law. We thus agree with the district court that Kombassan is responsible for HOM's withdrawal liability.

C.      Admissibility of Exhibit 16

Kombassan next challenges the district court's ruling that admitted into evidence the Plan's withdrawal liability calculation set out in Exhibit 16 notwithstanding Kombassan's objection that the Plan failed to lay an adequate foundation for the exhibit to be received as a business record. Kombassan argues that the district court improperly shifted the burden to Kombassan to state a "good faith basis for believing [Exhibit 16] is not an ordinary business record of the predecessor fund." Kombassan's objections were primarily that the file was not prepared by the witness from the Plan and that it pre-dated the witness's involvement with the HOM matter. Kombassan's challenge is without merit.

To establish a proper foundation for a document offered into evidence as a business record, the custodian or other qualified witness must testify that "the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the record." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995) (internal quotation marks and alterations omitted). "[T]here is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person." *Saks Int'l, Inc. v. M/V Exp. Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987).

The district court did not err in admitting Exhibit 16 into evidence as a record kept in the course of a regularly conducted business activity pursuant to Federal Rule of Evidence 803(6) because the Plan's employee, Warbet, testified that, as the person in charge of the Plan's administration, he took custody of the withdrawal liability files following the merger that created UNITE HERE and that Exhibit 16 was a standard demand for withdrawal liability. The district court did not unfairly shift the burden to Kombassan after it objected to Exhibit 16. The court merely inquired whether, after the Plan laid a sufficient foundation for Exhibit 16's admission as an ordinary business record, Kombassan had any good faith reason to believe it was not such a record. Kombassan's attorney stated that he did not. Accordingly, Exhibit 16 was properly admitted.

III.    **Conclusion**

We have considered all of Kombassan's remaining contentions on this appeal and have found them to be without merit. For the foregoing reasons, the judgment of the district court is **AFFIRMED**.