METAL LATHERS LOCAL 46 PENSION FUND, Metal Lathers Local 46 Trust Fund, Metal Lathers Local 46 Annuity Fund, Metal Lathers Local 46 Vacation Fund, Metal Lathers Local 46 Apprenticeship Fund, Metal Lathers Local 46 Scholarship Fund, Metal Lathers Local 46 Dental Fund, Metal Lathers Local 46 Promotion Fund, New York City District Council of Carpenters Pension Fund, New York City District Council of Carpenters Welfare Fund, New York City District Council of Carpenters Vacation Fund, and New York City District Council of Carpenters Annuity Fund, Plaintiffs,

v.

RIVER AVENUE CONTRACTING CORP., RNC Industries LLC, Extreme Contract Corp., Richard J. Tonyes, Sonia Tonyes, Robert Dugan, and Richard Tonyes, Jr., Defendants.

No. 13 CIV. 234 JSR.

United States District Court, S.D. New York.

July 22, 2013.

Elizabeth M. Pilecki, Serge Ambroise, Susan Marie Jennik, Thomas Martin Ken-

nedy, Kennedy, Jennik & Murray, P.C., New York, NY, for Plaintiffs.

Christopher A. Smith, Jonathan Michael Bardavid, Trivella & Forte LLP, White Plains, Ny, Daniel Joseph Kornstein, Ina R. Bort, Mark Andrew Platt, Kornstein Veisz Wexler & Pollard, LLP, New York, NY, for Defendants.

### MEMORANDUM

JED S. RAKOFF, District Judge.

On January 10, 2013, plaintiffs (the "Funds"), several union benefit funds established and maintained pursuant to collective-bargaining agreements ("CBAs"), filed suit alleging that defendant River Avenue Contracting Corp. ("River") and the individual defendants, Richard and Sonia Tonyes, Richard Tonyes, Jr., and Robert Dugan, fraudulently established alter ego entities, namely, defendants Extreme Concrete Corp. ("Extreme") and RNC Industries, LLC ("RNC"), in order to perform work covered by the CBAs between River and the Metal Lathers and Carpenters unions without paying contributions owed to the plaintiff Funds. Defendant Richard Tonyes is the owner of River, and the Amended Complaint alleges that he "is also the 100% owner of RNC and Extreme." Am. Compl. ("AC") ¶ 11. Sonia Tonyes, Richard Tonyes' wife, serves as the president "or other officer" of Extreme. *Id.* ¶ 12. Richard Tonyes, Jr. ("Tonyes, Jr."), the son of Richard Tonyes, and Dugan are "Field Superintendents" for RNC and River. *Id.* ¶¶ 13–14.

On March 11, 2013, plaintiffs filed an Amended Complaint, in which they raised nine claims: claims 1 through 4 allege violations of the Employee Retirement Income Security Act ("ERISA") against River, RNC and Extreme, *see* AC ¶¶ 62–88; claims 5 and 6 allege violations of the Labor Management Relations Act

("LMRA") by River, *see id.* ¶¶ 89–102; and claims 7 through 9 allege fraud, conspiracy to commit fraud, and aiding and abetting fraud under state law against all defendants except River, *see id.* ¶¶ 103–133.

On April 5, 2013, defendants filed motions to dismiss all claims alleged in the Amended Complaint except those brought under the LMRA against River. By Order dated June 10, 2013, the Court granted defendants' motion to dismiss the plaintiffs' ERISA, fraud, aiding and abetting fraud, and conspiracy claims, and denied plaintiffs' request to amend the complaint to name additional plaintiffs. This Memorandum explains the reasons for those decisions.

■ On a motion to dismiss, beyond the well-pleaded allegations in the Amended Complaint, the Court may also consider those documents "incorporated in [the Amended Complaint] by reference" and "matters of which judicial notice may be taken." *SEC v. Apuzzo*, 689 F.3d 204, 207 (2d Cir.2012) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir.2002)).

Plaintiffs in this action are the Metal Lathers Local 46 Pension, Trust, Annuity, Vacation, Apprenticeship, Scholarship, Dental, and Promotion Funds (the "Local 46 Funds"), AC ¶ 6, and the New York City District Council of Carpenters Pension, Welfare, Vacation, and Annuity Funds (the "Carpenters Funds"), AC ¶ 7. Each fund is an "employee benefit plan" and "multiemployer plan" within the meaning of 29 U.S.C. § 1002(3) and (37), and each group of funds is jointly administered by a Board of Trustees. *Id.* ¶¶ 6–7.

Defendant River is a party to CBAs with the Local 46 and Carpenters unions. Article III of the Local 46 CBA with River, entitled "Work Covered," "defines certain lather work as work that should be performed by individuals represented by Local 46," while Article XII imposes an obligation on River to contribute to the various Local 46 Funds for work completed by Local 46 members. AC ¶¶ 17, 16; Ex. B. Article XIX, entitled "Coverage of Lathing Work," requires River to assign any covered work to employees represented by Local 46 and forbids River from subcontracting such work unless the subcontractor is also bound by the same CBA. *Id.* ¶ 18. In relation to the Carpenters Funds, River is bound by three CBAs: a CBA with the United Brotherhood of Carpenters and Joiners of America, which requires member employers (including River) to pay contributions to local Carpenter Union funds as identified in the applicable independent CBA for their locality, *id.* ¶ 19; an Independent Building Construction agreement with the New York City District Council of Carpenters, *id.* ¶ 20 & Ex. C; and a multiemployer CBA with the New York City District Council of Carpenters, AC ¶ 21. The latter two agreements include as "covered work" any work performed by an employer that is of the type covered by these agreements and "includes work performed under the name of another corporation or business entity where the Employer exercises direct or indirect control over the terms and conditions set forth in both Agreements." *Id.* ¶ 22–23. These agreements require that benefits be paid even when work is performed by such an entity. *Id.*

Taking the facts alleged in the Amended Complaint as true for the purposes of this motion to dismiss, River and their shared principals have used RNC and Extreme as corporate "alter egos" to avoid hiring union labor for what should have been covered work under the CBAs with Local 46 and Carpenters, and thus fraudulently avoided making contributions to the Funds for such work. Specifically, the Amended Complaint alleges that, beginning in Janu-

ary 2006, Richard Tonyes caused River to send monthly reports to the Local 46 and Carpenters Funds "that purported to identify the number of hours of work" that fell within the jurisdiction of the relevant CBAs that had been performed by River. *Id.* ¶¶ 24–25. However, the Amended Complaint lists 25 projects occurring between 2006 and 2012, for which River, Extreme, or RNC provided covered work and which "River, Richard J. Tonyes and Sonia Tonyes deliberately omitted from the reports sent to" the Funds. *Id.* ¶¶ 26–28. Similarly, during the period of October 17, 2007 through September 29, 2009, Richard Tonyes and River made "cash payments to workers performing covered work" in order to avoid making benefit payments to the Funds *Id.* ¶ 114.

Based on these allegations, among others, the Funds assert claims under ERISA against River, RNC and Extreme for benefit contributions required by the CBAs. *See* 29 U.S.C. § 1145 ("Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall ... make such contributions in accordance with the terms and conditions of such plan or such agreement.").

The defendants first move to dismiss the Funds' ERISA claims, arguing that the Funds lack standing to sue under ERISA. Under Section 502(a)(3) of ERISA, "a civil action may be brought ... by a participant, beneficiary, or fiduciary" of an ERISA plan. 29 U.S.C. § 1132(a)(3). Here, plaintiffs are the employment benefit plans, not one of the enumerated plaintiffs granted standing to sue under ERISA, and so their ERISA claims must be dismissed. *See Pressroom Unions–Printers League Income Sec. Fund v. Cont'l Assur. Co.,* 700 F.2d 889, 891–93 (2d Cir.1983) (finding that 29 U.S.C. § 1132, which allows a "participant, beneficiary, or fiduciary" of a fund to bring claims, does not "authorize a pension fund to assert a cause of action," and therefore "the district court was without subject matter jurisdiction over the Fund's complaint"); *E. States Health & Welfare Fund v. Philip Morris, Inc.,* 11 F.Supp.2d 384, 401 (S.D.N.Y.1998) ("The Second Circuit has taken a very strict view of who has standing to bring suits under § 502, refusing to extend standing beyond the plaintiffs specifically named in ERISA.").

The Funds resist this conclusion, arguing that they can also claim federal jurisdiction under the substantive provision requiring contributions under ERISA, 29 U.S.C. § 1145; the general federal question jurisdictional statute, 28 U.S.C. § 1331; and the LMRA, 29 U.S.C. §§ 185. *See* AC ¶¶ 2–3. Turning first to § 1145, this provision creates a substantive right and does not include any language suggesting that Congress intended it to confer jurisdiction on its own. Indeed, the Second Circuit has expressly stated that this section "does not by itself confer jurisdiction; it is simply a substantive requirement that an employer make contributions to a multiemployer ERISA plan as specified in the plan or collective bargaining agreement." *Greenblatt v. Delta Plumbing & Heating Corp.,* 68 F.3d 561, 568 (2d Cir.1995). As the *Greenblatt* court explained, "[f]ederal jurisdiction over ERISA is created by § 502(f), 29 U.S.C. § 1132(f)," which "provides that federal district courts shall have jurisdiction of civil actions under § 502(a), 29 U.S.C. § 1132(a)...." *Id.* Thus, to the extent that plaintiffs seek to assert federal question jurisdiction under ERISA, they must fit within the requirements of § 502(a) and cannot separately look to § 1145.

Nor does the fact that the Amended Complaint pleads reliance upon the gener-

al federal jurisdictional statute cure plaintiffs' lack of standing under ERISA. Section 502 of ERISA creates a federal right only as to the parties enumerated in the statute; by that logic, parties not included within the statute cannot bring ERISA claims in federal court under § 1331, as they can assert no right arising under federal law. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) ("ERISA carefully enumerates the parties entitled to seek relief under § 502; it does not provide anyone other than participants, beneficiaries, or fiduciaries with an express cause of action.... A suit for similar relief by some other party does not 'arise under' that provision."). Additionally, the crux of the dispute here is whether the defendants have fulfilled their obligations under the CBAs. Thus, the parties' rights ultimately derive from these contracts, so there is no separate "federal question" likely to arise relating to the Funds' claims, making jurisdiction under § 1331 inappropriate. *See Greenblatt*, 68 F.3d at 571 (finding that where "the source of the rights or duties sought to be enforced" is a CBA between the parties, it is "of no moment that federal law provides a cause of action ... for violation" of the CBA for purposes of federal question jurisdiction under § 1331).

As for jurisdiction under the LMRA, the defendants do not contest that § 301 supports federal jurisdiction for the Funds' LMRA claims against River. *See* 29 U.S.C. § 185(a). However, that the LMRA claims are properly brought under

federal law does nothing to change the fact that the Funds are simply the wrong plaintiffs to raise the ERISA claims they seek to assert. And, while the Court may assert supplemental jurisdiction over the Funds' state law claims under 28 U.S.C. § 1367(a), supplemental jurisdiction cannot create a federal statutory right of action for the Funds where none exists. In sum, the plaintiff Funds do not have standing to bring claims under ERISA, and no attempt to assert federal question jurisdiction under any other statutory provision can cure that problem.

■ Absent standing to bring their ERISA claims, plaintiffs seek leave to amend again the Amended Complaint to add as plaintiffs a trustee for the Carpenters Funds and a trustee for the Local 46 Funds. Although "[t]he court should freely give leave [to amend] when justice so requires," Fed.R.Civ.P. 15(a)(2), such an amendment, in this case, would "not relate back to the original suit, and would be a new action." *Pressroom*, 700 F.2d at 893 n. 9. Given that the defendants have raised concerns regarding whether the addition of a single trustee for each family of funds would be sufficient under the terms of the relevant CBAs, the Court finds that the more prudent course is to dismiss the Funds' ERISA claims for lack of standing and allow the Funds' trustees to file a separate suit, as they now have,[1] to be consolidated with this action.

■ Defendants alternatively move to dismiss the Funds' ERISA claims for failure to state a claim against Extreme and RNC, nonsignatories to the relevant CBAs, because, they claim, the Funds failed to sufficiently plead that Extreme and RNC are the alter egos of River. *See*

---

1. On June 18, 2013, multiple trustees for each family of funds filed a separate action, *Moore v. River Avenue Contracting Corp.*, 13 Civ. 4205, which raises substantially identical claims to those asserted in this action.

*Lihli Fashions Corp., Inc. v. N.L.R.B.*, 80 F.3d 743, 748 (2d Cir.1996) (per curiam) ("If two companies are deemed alter egos of each other, then each is bound by the collective bargaining agreements signed by the other."). Although the Funds' lack of standing is sufficient to warrant dismissal of the Amended Complaint's ERISA claims, it may be useful to all concerned to address these arguments for dismissal.

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "allege a plausible set of facts sufficient to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This standard demands that a plaintiff set forth factual allegations that, if accepted as true, are sufficient to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

As an initial matter, defendants argue that the Amended Complaint fails to adequately allege that River failed to make required contributions under the CBAs. Specifically, they claim that the Amended Complaint fails to allege what kind of work was being done at the alleged under-reported job sites, by whom, how extensive the underreporting may have been, or how River's monthly reports were used to calculate contributions. Yet the Amended Complaint alleges 25 different specific jobs, including locations and dates, as to which the Funds believe that River failed to fully report the hours covered by the CBAs. *See* AC ¶¶ 26–28. The Amended Complaint further asserts that the allegedly false monthly reports were in relation to work "within the jurisdiction of" the relevant union, so the Court may infer from the incorporated CBAs what kind of work

was being done. *Id.* ¶¶ 24–25. Read most favorably to the plaintiffs, the Amended Complaint's factual allegations suggest that River had a practice of doling out work to Extreme and RNC to avoid its union obligations, providing a sufficient factual basis to suggest that River had in fact misrepresented to the unions the hours of covered work and therefore underpaid contributions it owes to the Funds. Therefore, the Amended Complaint adequately alleges an ERISA claim against River such that an alter ego claim against RNC and Extreme is plausible.

The Court thus turns to whether the Amended Complaint also pleads adequate factual content to suggest that Extreme and RNC operate as River's alter egos. "The focus of the alter ego doctrine ... is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." *Lihli*, 80 F.3d at 748. Therefore, to determine whether an alter ego relationship exists between two companies, courts look to "commonality of (i) management, (ii) business purpose, (iii) operations, (iv) equipment, (v) customers, and (vi) supervision and ownership, as well as [ ] whether the succession of employers was motivated by anti-union sentiment." *Newspaper Guild of N.Y., Local No. 3 v. N.L.R.B.*, 261 F.3d 291, 294 (2d Cir.2001).

The Amended Complaint contains extensive allegations regarding the connections among these three entities, and the Court recites here only the most pertinent allegations. First, the Amended Complaint alleges that "RNC, Extreme, and River have substantially identical management and supervision," as well as substantially identical business purposes. AC ¶ 60. Specifically, the Amended Complaint alleges that "RNC, Extreme, and

River perform identical concrete construction work in the New York City metropolitan area, frequently for the same customers," and that "Richard J. Tonyes is in charge of all operations for River, Extreme, and RNC." *Id.* ¶ 60(a), (b). Additionally, "[o]ther managerial employees, such as Dugan, Richard Tonyes, Jr., and Steven Gillman appear to have worked simultaneously for both River and RNC." *Id.*

Next, the Amended Complaint alleges that the three entities share common locations, which, along with sharing a common agent for service of process, common insurance broker, and common legal counsel, suggest substantially identical operations. *See id.* ¶¶ 34, 40. In particular, the Amended Complaint alleges that River and RNC are both located at 720 Blue Point Road, Holtsville, New York. *Id.* ¶¶ 8, 9. Since January 2007, 720 Blue Point Road has been owned by 720 Blue Point Road Realty Corp., for which Sonia Tonyes is listed as CEO in state corporate filings, although Richard Tonyes was identified as the company's owner in a court document. *Id.* ¶ 58. River's other address is 9 Claremont Avenue, Holbrook, New York, which is the same location as 11 Claremont Avenue, the address of Extreme. *Id.* ¶¶ 8, 10.

Additionally, in what is alleged to be a common scheme among the three entities, between January and September 2009, Sonia Tonyes, the nominal president of Extreme, signed a series of at least twenty-two corporate checks on behalf of River made out to "Cash," totaling approximately $95,000. AC ¶¶ 35–36. "[U]pon information and belief, ... the money drawn from those checks was used to pay cash wages to employees of River, RNC, and/or Extreme who performed covered work and whose work hours were not reported to the Local 46 Funds or Carpenters Funds." *Id.* ¶ 37. "In addition to those checks, from 2007 to 2011, Extreme and Sonia Tonyes paid millions of dollars in cash payments to employees performing covered work within the jurisdictions of Local 46 and the Carpenters." *Id.* ¶ 36.

In looking at the bilateral relationships between Extreme and River, and RNC and River, respectively, the Amended Complaint contains substantial factual content to suggest common customers, supervision, and ownership, as well as the plausible inference that anti-union animus motivated the decision to shift work from River to RNC and Extreme. *See Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir.2010) (finding that, although "anti-union animus or an intent to evade union obligations is not a *necessary* factor," it may be a "germane or sufficient basis for imposing alter ego status" (internal quotation marks omitted)).

As to Extreme, and, again, taking as true on this motion to dismiss the allegations in the Amended Complaint, the Carpenters, in 2006, initiated arbitration with, among other allegedly related companies, River and Extreme, in which they claimed that, between 2003 and 2006, Extreme served as an alter ego of River and that River was obligated to make benefit fund contributions to the Carpenters Funds based on covered work performed by Extreme. AC ¶ 30. An arbitrator concluded that River and Extreme "meet the affiliate/subsidiary criteria set forth in the [CBA]" and directed that River facilitate an audit by the Carpenters of the books and records of Extreme. *Id.* & Ex. D. After the Carpenters filed a petition to confirm the arbitration award, Tonyes submitted an affidavit asserting that he was "not a shareholder, officer, director and/or employee of Extreme" and thus he was "unable to facilitate an audit of such entities." AC ¶ 31 & Ex. E. Although River

later entered into a stipulation agreeing to facilitate the Carpenters Funds' audit of River's and Extreme's books and records, Tonyes and River failed to produce accurate books and records, as the books failed to include cash payments to employees. *Id.* ¶ 114. Finally, despite claiming no role at Extreme during this time period, Richard Tonyes pleaded guilty in March 2012 to failure to pay federal payroll taxes on behalf of Extreme, at which time he admitted that he was the operator of Extreme in 2007. AC ¶¶ 32–33 & Ex. F. This sequence of events plausibly suggests that Tonyes in fact was (and perhaps still is) the owner and operator of Extreme and intended to deceive the Carpenters in order to avoid paying amounts owed to their benefits funds.

As to RNC, the Amended Complaint alleges that "Richard J. Tonyes began to use RNC as his main alter ego of River for performing work covered by the Local 46 and the Carpenters [CBAs] starting in or around 2006," implying that Tonyes decided to shift from Extreme to RNC because of the grievance brought by the Carpenters Funds in 2006. AC ¶ 41. The Amended Complaint suggests an attempt to hide Tonyes' ownership of RNC, as it claims that "[o]n October 18, 2011, RNC falsely reported to the New York City Department of Buildings ... that it was 50% owned by Dugan and 50% owned by Tonyes, Jr.," *id.* ¶ 42 & Ex. K, and that Richard and Sonia Tonyes "instructed Dugan to initially identify the location of RNC as his home address," although RNC was always operated out of 9 Claremont Avenue, which is owned by Richard and Sonia Tonyes. *Id.* ¶¶ 57, 59. As further evidence of Richard Tonyes' ownership of RNC, the Amended Complaint alleges that Richard Tonyes "has the power to and does direct labor relations at the RNC work sites. Dugan, the putative owner of RNC has told RNC employees that if they

want a raise in their hourly pay," they should talk to Tonyes, and that Tonyes has made the decision to grant those pay increases. AC ¶¶ 48–51. The Amended Complaint further alleges that Tonyes "routinely visits all RNC jobs in his capacity as owner of RNC," has criticized Dugan for errors made on RNC job sites, and has "sent a memorandum to all River and RNC employees" rescheduling their regular workday. *Id.* ¶¶ 52–54. Finally, the Amended Complaint alleges that in 2010 and 2011, River and RNC claimed to perform the same covered work for the same customers, in letters using nearly identical language and notarized by the same individual, without reporting to the Funds the hours worked in covered employment on those projects. *See id.* ¶¶ 43–46 & Exs. L, M.

Although the defendants attempt to pick apart these factual allegations to suggest that individual allegations are conclusory or individually insufficient to support an alter ego theory, the Amended Complaint in total paints a factually detailed picture that, if taken as true, suggests that Richard Tonyes created RNC and Extreme to avoid handling jobs under the auspices of River, which would have required him to contribute to the plaintiff Funds. Thus, the Amended Complaint pleads sufficient facts to suggest that RNC and Extreme are alter egos of River and should be deemed equally bound by River's collective bargaining obligations.

RNC and Extreme argue that there are alternative, innocent explanations for the relationship between the companies that, they claim, are more plausible than the inference the plaintiffs ask the Court to draw. For example, defendants argue that Richard Tonyes' and River's relationship with RNC, at least nominally owned in part by Tonyes' son, is merely the kind of intertwined relationship that one would

expect to see when a father and son operate businesses in the same industry. Alternatively, defendants argue that even if the Court were to accept that Richard Tonyes and River created RNC, the fact that Tonyes created a parallel, non-union construction company to do non-union work is innocuous and not indicative of an attempt to avoid River's union obligations, given that there are parallel union and non-union markets in the construction industry in which companies seek to compete. Finally, defendants suggest that it is implausible that RNC and Extreme were formed in order to evade River's obligations under its CBAs because the Amended Complaint alleges that River continued to enter into new collective bargaining obligations after RNC was formed, *see* AC ¶ 15, and that River and RNC worked on the same projects at the same time, *see id.* ¶ 45.

However, these explanations are insufficient to displace the Amended Complaint's narrative as the most plausible inference from the facts pleaded. As an initial matter, the "[p]arallel existence" of the three entities "is not an impediment to imposing alter ego status" where other evidence of such a relationship is present. *Kombassan Holding*, 629 F.3d at 288. Additionally, the notion that a father might take an active role in his son's business, while believable on its own, does not explain the entirety of the actions of the defendant companies, such as Tonyes' inconsistent statements regarding the nature of his role at Extreme. As for defendants' parallel-markets theory, accepting—at the pleading stage no less—the notion that ownership of a union and a non-union company is inherently innocuous would completely undermine the theory of alter ego liability, as facts consistent with both explanations would always appear. At least at this stage and in the presence of allega-

tions suggesting an attempt to hide covered work from the Funds, whether that characterization of the defendant corporations' relationships will prove accurate must await further fact discovery.

Turning to defendants' motion to dismiss the Amended Complaint's state law claims for fraud, conspiracy to commit fraud, and aiding and abetting fraud, the defendants primarily argue that these state law claims are preempted by ERISA. "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004). In order to achieve this end, ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute. 29 U.S.C. § 1144(a). Based on this language, the Supreme Court has held that ERISA preempts "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy." *Davila*, 542 U.S. at 209, 124 S.Ct. 2488. Only where a plaintiff seeks "to remedy [a] violation of a legal duty independent of ERISA" does ERISA not preempt a state law claim. *Id.* at 214, 124 S.Ct. 2488.

Here, defendants argue that the Funds' state law claims are predicated upon the alleged failure of defendants to make contributions to the Funds as required by the CBAs. *See* AC ¶¶ 116, 124, 133 (claiming that the defendants "are jointly and severally liable with River for any contributions due and owing ... based on their knowing participation in a scheme to underpay River's contributions to the Funds"). Although plaintiffs are undoubtedly correct that ERISA's preemption provision "does not sweep all state law off the table," *Sharp Electronics Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir.2009), this is not, as plaintiffs claim, a situation in

which a plan covered by ERISA is merely "the context in which [a] garden variety fraud occurred," *Geller v. Cnty. Line Auto Sales, Inc.,* 86 F.3d 18, 23 (2d Cir.1996). Rather, the very fraud claimed here is a scheme to avoid making the contributions that ERISA requires. Because the Funds' state law fraud claims "merely duplicate plaintiff's causes of action under ERISA," they "are therefore preempted," and must be dismissed. *DePasquale v. DePasquale,* No. 12–CV–2564, 2013 WL 789209, at \*7 (E.D.N.Y. Mar. 1, 2013).

However, in dismissing the Funds' state law claims as preempted by ERISA, it must be noted that, "to the extent that a controlling corporate official defrauds or conspires to defraud a benefit fund of required contributions, the official [may be held] individually liable under Section 502 of ERISA." *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo,* 35 F.3d 29, 32 (2d Cir.1994) (quoting *Leddy v. Standard Drywall, Inc.,* 875 F.2d 383, 388 (2d Cir.1989)). To meet the test for individual liability under ERISA, the Court must look first to whether the individual defendant qualifies as a "controlling corporate official." *Id.* In making this inquiry, "an individual cannot be held liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager. Beyond his status within the corporate structure, the district court must examine the officer's actual role in the company's affairs and relationship to the company's wrongdoing." *Id.* at 33. After determining whether an individual defendant so qualifies, the plaintiff must establish all of the common law elements of fraud: "a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP,* 12 N.Y.3d 553, 883 N.Y.S.2d 147, 910 N.E.2d 976, 979 (2009).

Here, however, the Funds did not plead ERISA violations against the various individual defendants; rather, the Amended Complaint alleges only state law claims for fraud, aiding and abetting fraud, and conspiracy to commit fraud, which the Court herein finds to be preempted by ERISA. Moreover, had the Funds pleaded claims under ERISA against the individual defendants, those claims would have been dismissed, just as the ERISA claims against River, RNC and Extreme were dismissed, for lack of standing. Thus, the Court, in its Order dated June 10, 2013, granted defendants' motion to dismiss the plaintiffs' state law claims without prejudice to a proper plaintiff raising ERISA claims against the individual defendants.

In sum, for the reasons above, the Court granted defendants' motion to dismiss the Amended Complaint's ERISA, fraud, aiding and abetting fraud, and conspiracy claims, and denied plaintiffs' request to amend the complaint to name additional plaintiffs. As noted above, this action will proceed solely against River Avenue and only as to plaintiffs' LMRA claims.

SO ORDERED.