13-447-cv (L)
*Amara v. CIGNA Corp.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2013

Argued: February 10, 2014
Decided: December 23, 2014

Nos. 13-447-cv (Lead), 13-526 (XAP)

_____

JANICE C. AMARA, GISELA R. BRODERICK, AND ANNETTE S. GLANZ, individually
and on behalf of others similarly situated,

*Plaintiffs-Appellants-Cross-Appellees*,

v.

CIGNA CORPORATION AND CIGNA PENSION PLAN,

*Defendants-Appellees-Cross-Appellants.*

_____

Before:      JACOBS, LIVINGSTON, LYNCH, *Circuit Judges*.

Appeal from a January 2, 2013 order of the United States District Court for the District of Connecticut (Arterton, *J.*).  The district court, *inter alia*, reformed CIGNA Corporation's pension benefits plan to reflect the fact that all class members must now receive "A+B" benefits.  We conclude that the district court did not err in

finding that the elements of reformation were met, that it properly denied the motion of CIGNA Corporation and CIGNA Pension Plan to decertify the class of plaintiffs seeking relief in this case, and that it was within the district court's discretion to reform the plan such that it provides class members with A+B benefits.

AFFIRMED.

STEPHEN R. BRUCE (Allison C. Pienta, *on the brief*), Stephen R. Bruce Law Offices, Washington, D.C.; Christopher J. Wright, Wiltshire & Grannis, LLP, Washington, D.C., *for Plaintiffs-Appellants-Cross-Appellees*.

JEREMY P. BLUMENFELD (Joseph J. Costello and A. Klair Fitzpatrick, Morgan, Lewis & Bockius LLP, Philadelphia, PA; Stephanie R. Reiss, Morgan, Lewis & Bockius LLP, Pittsburgh PA, *on the brief*), *for Defendants-Appellees-Cross-Appellants*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This long-running dispute arises from certain misleading communications made by CIGNA Corporation ("CIGNA") and CIGNA Pension Plan (together with CIGNA, "defendants") to CIGNA's employees regarding the terms of the CIGNA Pension Plan and, in particular, the effects of the 1998 conversion of CIGNA's defined benefit plan ("Part A") to a cash balance plan ("Part B"). The case was brought in December 2001 by individual plan participants on behalf of themselves

and others similarly situated ("plaintiffs"). The district court granted plaintiffs' motion to certify the class. After trial, it held, *inter alia*, that defendants had failed to provide notice of a significant reduction in the rate of future benefit accrual under the Part B retirement plan in violation of § 204(h) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1054(h), and that defendants failed adequately to disclose material modifications to the plan in violation of ERISA § 102, 29 U.S.C. § 1022. *Amara v. CIGNA Corp.*, 534 F. Supp. 2d 288, 363 (D. Conn. 2008) [hereinafter "*Amara I*"]. The district court then issued a decision regarding appropriate relief under ERISA for that violation, ordering defendants to provide the benefits accrued under Part A at the time of the conversion plus the benefits accrued thereafter under Part B, *i.e.* "A+B" benefits, and to issue new or corrected notices to all class members under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). *Amara v. CIGNA Corp.*, 559 F. Supp. 2d 192, 222 (D. Conn. 2008) [hereinafter "*Amara II*"]. This Court affirmed those decisions by summary order, *Amara v. CIGNA Corp.*, 348 Fed. App'x 627 (2d Cir. 2009), and both parties petitioned for certiorari.

The Supreme Court granted defendants' petition and, in a decision issued on May 16, 2011, vacated this Court's judgment and remanded the case, concluding that the relief afforded by the district court was not available under § 502(a)(1)(B).

3

*CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1870-71 (2011) [hereinafter "*Amara III*"]. The Supreme Court instructed, however, that the district court should consider on remand whether plaintiffs are entitled to relief under § 502(a)(3), 29 U.S.C. § 1132(a)(3), which provides for "appropriate equitable relief" to redress specified violations of ERISA or of plan terms. *Amara III*, 131 S. Ct. at 1882. In light of its decision to grant defendants' petition for certiorari and remand the case, a week later, on May 23, 2011, the Supreme Court also granted plaintiffs' petition, *see Amara v. CIGNA Corp.*, 131 S. Ct. 2900 (2011) [hereinafter "GVR Order"], which requested the Supreme Court to review this Court's affirmance of the district court's decision to order A+B benefits rather than a return to the Part A plan. *See* Petition for Writ of Certiorari, *Amara v. CIGNA Corp.*, 131 S. Ct. 2900 (2011) (No. 09-784), 2010 WL 17042. In accordance with the Supreme Court's decisions, this Court vacated the district court's judgment on July 11, 2011, and remanded the case for further proceedings.

On remand, the district court denied a motion by defendants to decertify the class and again ordered CIGNA to provide plaintiffs with A+B benefits and new or corrected notices, this time ordering such relief under § 502(a)(3). *Amara v. CIGNA Corp.*, 925 F. Supp. 2d 242, 265-66 (D. Conn. 2012) [hereinafter "*Amara IV*"]. The

4

present appeals ensued. CIGNA argues that the district court erred in declining to decertify the class and in ordering equitable relief pursuant to § 502(a)(3). Plaintiffs argue that the court erred in limiting relief to A+B benefits, as opposed to affording them the benefits they would have received pursuant to Part A.

We conclude, first, that the district court acted within the scope of its discretion in denying CIGNA's motion to decertify the plaintiff class. Next, we conclude that the district court did not abuse its discretion in determining that the elements of reformation have been satisfied and that the plan should be reformed to adhere to representations made by the plan administrator. Finally, based on the particular facts of this case, we hold that the district court did not abuse its discretion in limiting relief to A+B benefits rather than ordering a return to the terms of CIGNA's original retirement plan.

## BACKGROUND

### A. Facts

The facts of this case are set forth in considerable detail in the several prior opinions concerning this matter and we do not repeat them all here. This litigation stems from CIGNA's alteration of the terms of its standard pension benefit plan in 1998. CIGNA's original plan--Part A--granted beneficiaries defined benefits upon

retirement. These defined benefits were generally provided in the form of an annuity in an amount based upon a number of factors such as the employee's salary, date of first employment at CIGNA, years of service, and age at retirement. By contrast, the new plan--Part B--provided benefits to most of CIGNA's employees in the form of a lump sum cash balance calculated on the basis of defined annual contributions.[1] Under Part B, an employee could choose at retirement to receive his or her account balance in lump sum form or else as whatever annuity that lump sum could buy at the time that employee retired. To facilitate the transition between the plans, the new Part B plan included a formula whereby an employee would accrue new benefits to be deposited into his or her retirement account, as well as a formula for converting an employee's already-accrued Part A benefits into a Part B cash balance. The new plan also guaranteed that employees would receive at least the value of their already-accrued Part A benefits. That is, if an employee's total Part B benefits at retirement, including that employee's initial account balance and all benefits accrued by that employee under Part B thereafter, amounted to less than the total of that employee's Part A benefits as of December 31, 1997, then the employee

---

[1] Employees with a combined age and service of 45 years or more were grandfathered under the old Part A plan and continued to accrue benefits under that plan.

6

would receive the amount of his or her Part A benefits rather than the amount in the employee's account under Part B.

Instead of shifting immediately to Part B, CIGNA accomplished the transition between the plans in two stages. CIGNA first froze its Part A plan. As communicated to employees in a November 1997 newsletter, employees' Part A benefits ceased accruing as of December 31, 1997. Employees' account balances were then calculated during 1998, and balances were retroactively credited to each employee as of January 1, 1998.

CIGNA communicated the terms of the new plan and the process for plan conversion to its employees through that November 1997 newsletter, as well as through a summary of material modifications to the plan, two summary plan descriptions ("SPDs"), and other materials. Among other things, CIGNA told employees that the new plan would "significantly enhance its retirement program." E-204. One SPD describing the plan informed each employee that "your benefit will grow steadily throughout your career." E-265. It also told each employee that his or her "opening balance [in the new Part B plan] was equal to the lump sum value of the pension benefit [he or she] earned through December 31, 1997." *Id.* In individualized compensation reports, CIGNA assured each employee that his or her

7

initial account balance "represent[ed] the full value of the benefit [he or she] earned for service before 1998 payable to you at age 65."[2] J.A. 138. CIGNA also stated in a newsletter introducing the new plan that it would not receive any cost savings from its conversion from Part A to Part B.

The parties do not dispute that CIGNA's communications regarding its new plan were inaccurate. CIGNA actually saved an estimated $10 million by converting to its Part B plan. Contrary to CIGNA's descriptions of the plan to its employees, moreover, the new Part B plan did not preserve the full value of each employee's Part A benefits. The new plan was inferior in a number of critical ways. For instance, under Part A, employees had a valuable right to retire early with only moderately diminished benefits – a right that the Part B plan did not preserve. And at least two additional features left many employees worse off:

First, the amount in each employee's initial retirement account actually *did not* reflect the entirety of that employee's Part A benefits because the calculation converting Part A benefits into the Part B lump sum included an adjustment that reduced each employee's account balance. This "haircut" was undertaken to offset

_____

[2] For certain employees, the value of the account was calculated according to a retirement age of 62 rather than 65 and those employees' individualized compensation reports reflected this fact. *See, e.g.*, E-1328 (providing an example of a compensation report for one such employee).

the fact that under the new Part B plan, an employee's survivors were guaranteed to receive that employee's benefits (whether or not the employee died before retirement) whereas under Part A, the employee received benefits in annuity form (and therefore only received benefits if he or she was still alive at retirement). To compensate for this change, each employee's Part A benefits were not only converted into lump sum form, but were also discounted by the probability that the employee would live to retirement age. For example, if according to CIGNA's model, an employee had a 90% chance of living to retirement, the amount obtained by converting his or her Part A benefits into a lump sum was multiplied by 90% to obtain that employee's initial account balance. This meant that those employees surviving to retirement would receive *less* in retirement benefits than they otherwise would have received under Part A.

Second, under the new Part B plan, employees were not protected from fluctuating interest rates as they were under the Part A plan. The amount that an employee received under Part A was fixed according to factors, such as the employee's salary, which do not directly depend on interest rates. By contrast, the amount an employee receives under Part B is dependent on interest rates in two ways: (i) the rate of accrual of an employee's Part B account hinges on interest rates;

9

(ii) if an employee were to elect to receive an annuity at retirement under Part B, the price of the annuity would be affected by the then-current interest rate (so that an employee would receive a lower annual benefit for the same lump sum price if interest rates were low when he or she retired). Because people tend to be risk averse with respect to their retirement savings, the insulation from interest-rate risk under the Part A plan was valuable.

Because of these differences between Part A and Part B, employees also risked experiencing what is known in the benefits industry as "wear away." Wear away occurs when an employee continues to work at a company but does not receive additional benefits for those additional years of service. While the new plan did guarantee that an employee would receive at least the amount of his or her Part A benefits as of December 31, 1997, it was possible for an employee to work for years after the conversion date before the amount in that employee's Part B account equaled the amount of benefits the employee would have been due under Part A at the time of the switch.

## B. Procedural History

In 2001, plaintiffs, acting on behalf of approximately 25,000 beneficiaries of the CIGNA Pension Plan, filed suit. Plaintiffs claimed, *inter alia*, that by failing to give

them proper notice of their benefits and misleading them regarding the nature of their benefits, defendants violated §§ 102(a) and 204(h) of ERISA, 29 U.S.C. §§ 1022(a) and 1054(h). In 2008, in a decision pertaining solely to CIGNA's liability, Judge Kravitz of the United States District Court for the District of Connecticut agreed that defendants had violated ERISA. *Amara I*, 534 F. Supp. 2d at 363. He held that the appropriate standard of injury for determining whether an ERISA violation has occurred is "likely harm," and concluded that plaintiffs had demonstrated likely harm in this case. *Id.* at 351, 354. In a separate decision, the district court ordered CIGNA to reform the terms of its plan under § 502(a)(1)(B), which allows a plan "participant or beneficiary" to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *Amara II*, 559 F. Supp. 2d at 222. Although plaintiffs indicated their preference for "a declaration that Part B is void and an injunction ordering a return to Part A," the district court instead ordered CIGNA to reform the terms of its plan to provide A+B benefits. *Id.* at 203, 222. Under this remedy, CIGNA was required to ensure that "all class members . . . receive their accrued benefits under Part A, in the form in which those benefits were available under Part A, and in

11

addition their accrued benefits under Part B, in whatever form those benefits are available under Part B."  *Id.* at 222.[3]

The district court expressed doubt regarding whether relief would be available to plaintiffs under § 502(a)(3), which provides for equitable relief.  *Id.* at 205-06.  But because the court ordered relief under § 502(a)(1)(B), it declined to examine fully whether relief was available under § 502(a)(3).  *Id.*  Critically, in ordering relief under § 502(a)(1)(B), the district court held that "the materially misleading statements in CIGNA's notices and disclosures" actually "constitute benefits under the terms of the plan."  *Id.* at 205.  The district court found that CIGNA's misleading communications promised A+B benefits and that because these communications could be interpreted as the actual terms of the plan, plaintiffs were entitled to A+B benefits.  *Id.* at 204-05.

---

[3] We note that the term "A+B" is slightly misleading since the district court's remedy does not actually award an employee the total of all his Part A benefits plus all of the benefits that would be due to that employee if Part B were fully implemented.  Instead, the remedy ordered by Judge Kravitz consists only of the Part A benefits accrued through December 31, 1997, plus the Part B benefits accrued going forward from January 1, 1998. The "A+B" remedy thus does not include the amount of Part B benefits resulting from the conversion of an employee's Part A benefits into a lump sum amount.  As Judge Kravitz pointed out, Section 701(a)(1) of the Pension Protection Act (amending ERISA § 204(b), 29 U.S.C. 1054(b)) now requires this A+B benefits structure for all new plans resulting from transitions from cash balance plans that take place after June 29, 2005. *See Amara II*, 559 F. Supp. 2d at 212 n.6.

The district court noted "the peculiar factual circumstances" which led it to conclude that the appropriate remedy was to order CIGNA to provide its employees with A+B benefits rather than to require a return to Part A. *See id.* at 206-11. ERISA § 204(h) allows for the invalidation of plan amendments not preceded by proper notice. *Id.* at 209. The court observed, however, that such a remedy under § 204(h) "would be cold comfort to Plaintiffs" because of the manner in which CIGNA's new plan was implemented. *Id.* at 209-10. The district court explained that CIGNA "unambiguously froze benefit accruals under Part A, and no one disputes that Amendment 4 [to CIGNA's Pension Plan, imposing this freeze] was validly noticed under § 204(h) or that CIGNA employees understood that Part A was being frozen." *Id.* at 207. Accordingly, a remedy under § 204(h) "would be a return not to a viable benefit plan, but to a freeze." *Id.* at 209. At the same time, the district court determined that "the remedy for the first two disclosure violations, regarding wear away and early retirement benefits, is straightforward." *Id.* at 211. It found that CIGNA's statements "created a reasonable expectation on the part of plan participants that Part B would protect *all* Part A benefits, including early retirement benefits . . . and that Part B benefits would begin accruing immediately." *Id.* (emphasis in original). Because defendants' representations misled beneficiaries into

13

thinking that these were the terms of the plan, the district court held that "these representations have become the terms of the Plan," and the court ordered CIGNA to provide benefits according to those terms under § 502(a)(1)(B).[4] *Id.* at 212.

The parties cross-appealed the district court's decision. Plaintiffs argued that the district court should have ordered a full return to Part A benefits, while defendants argued that no change in the plan should have been ordered at all. This Court affirmed the decisions of the district court by summary order. *Amara v. CIGNA Corp.*, 348 Fed. App'x at 627. The Supreme Court then granted certiorari on the question whether "likely harm" is the appropriate standard to apply in determining CIGNA's liability under ERISA. *Amara III*, 131 S. Ct. at 1871. But the Supreme Court found that it could not answer this question without first examining whether § 502(a)(1)(B) authorized the relief that the district court had granted. *Id.* The Supreme Court held that it was inappropriate for the district court to grant the remedy of A+B benefits under § 502(a)(1)(B) because documents summarizing the plan could not "constitute the *terms* of the plan for purposes of § 502(a)(1)(B)." *Id.* at 1878 (emphasis in original).

---

[4] The district court followed the analysis of this Court in *Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006), which reasoned that an SPD "is of such importance that 'where the terms of the plan and the SPD conflict, the SPD controls.'" *Id.* at 265 (quoting *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003)).

Yet, the Supreme Court found that § 502(a)(3), which provides for "appropriate equitable relief" to redress specified violations of ERISA or the terms of a plan, "authorizes forms of relief similar to those that the court entered." *Id.* at 1871. It determined that "[t]he District Court strongly implied, but did not directly hold, that it would base its relief upon [§ 502(a)(3)] were it not for (1) the fact that . . . § 502(a)(1)(B) . . . provided sufficient authority; and (2) certain cases from this Court that narrowed the application of the term 'appropriate equitable relief.'" *Id.* at 1878. Concluding that the district court was mistaken in its assumption that prior cases might foreclose the remedy at issue here from being "appropriate equitable relief" under § 502(a)(3), it invited the district court to examine three equitable remedies that the district court's relief resembled: reformation, estoppel, and surcharge. *Id.* at 1879-80.

The Court then concluded, regarding the question on which it had granted certiorari, that "the relevant standard of harm will depend upon the equitable theory by which the District Court provides relief." *Id.* at 1871. It remanded for the district court to analyze whether the requirements for any of these equitable remedies had been met, stating that "[w]e cannot know with certainty which remedy the District Court understood itself to be imposing, nor whether the District Court will find it

15

appropriate to exercise its discretion under § 502(a)(3) to impose that remedy on remand." *Id.* at 1880.

On remand, in a decision by Judge Arterton, the district court found both reformation and surcharge to be available based on the facts of the case. *Amara IV*, 925 F. Supp. 2d at 251.[5] The district court next determined that reformation did not require decertification of the Rule 23(b)(2) class, concluded that "[s]urcharge . . . presents thornier issues under (b)(2)," and accordingly elected to "order reformation rather than surcharge." *Id.* at 263-64. Turning to the substance of the appropriate remedy, the district court approvingly incorporated Judge Kravitz's earlier "calibration of the interests at stake" and exercised its discretion to require defendants to reform the plan to provide A+B benefits. *Id.* at 265. It stated that "class members will receive (1) the full value of 'their accrued benefits under Part A,' including early retirement benefits, in annuity form; and (2) 'their accrued benefits under Part B,' in annuity or lump sum form." *Id.* (quoting *Amara II*, 559 F. Supp. 2d at 222). It stated that "retirees and former employees will be entitled to receive the difference in value between the full-value of the Part A annuity . . . and the lump sum." *Id.* The court required these "past-due benefits to be paid in a lump

---

[5] Having found these remedies to be available, the court declined to examine whether estoppel could also be established. *Id.*

16

sum" and for those employees to receive "the amount of the [Part B] monthly annuity payments going forward.'" *Id.* (internal quotation marks omitted). Both parties again appealed.

## DISCUSSION

We review the district court's decision regarding class certification and its determinations regarding whether the individual requirements of Federal Rule of Civil Procedure 23 have been met for abuse of discretion. *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Id*. The district court's award of equitable relief also may be reversed "only for an abuse of discretion or for a clear error of law." *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1214 (2d Cir. 1993). Where the district court's determinations regarding class certification and equitable remedies are supported by findings of fact, such findings are reviewed under the "clearly erroneous" standard. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 116 (2d Cir. 2013) (discussing the standard of review for class certification); *EEOC v. KarenKim, Inc.*, 698 F.3d 92, 99 (2d Cir. 2012) (per curiam) (discussing the standard of review for injunctive relief). To the extent they rely on conclusions of law, these legal

17

conclusions are reviewed *de novo*. *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 18

(2d Cir. 2003) (discussing the standard of review for class certification); *KarenKim*,

698 F.3d at 99 (discussing the standard of review for injunctive relief).

### A. Class Certification

Certification of a class under Rule 23(b)(2) is appropriate where the remedy

sought is "an indivisible injunction" that applies to all class members "at once."[6]

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011). Class actions based on

claims for individualized monetary relief – implicating the due process rights of

absent class members, who need not be given notice and opt-out rights pursuant to

---

[6] Rule 23 provides in relevant part as follows:

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

    (1) the class is so numerous that joinder of all members is impracticable;
    (2) there are questions of law or fact common to the class;
    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
    (4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if . . .

    (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . .

18

Rule 23(b)(2) – are impermissible under this provision. *See id.* at 2558-59. The Supreme Court has left open the question whether incidental monetary relief may be sought on a class-wide basis pursuant to Rule 23(b)(2). *See id.* at 2560. But our sister circuits have concluded that such relief may be appropriate where it "flow[s] directly from liability to the class *as a whole*" from "claims forming the basis of . . . injunctive or declaratory relief." *Id.* (emphasis in original) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998)); *see also Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 371 (7th Cir. 2012) (concluding that incidental monetary relief may be awarded in a Rule 23(b)(2) class action pursuant to a pension plan's reformation). We find these decisions persuasive and conclude that, while *Wal-Mart* abrogates the standard for monetary relief in Rule 23(b)(2) class actions that we announced in *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001), it does not foreclose an award of monetary relief when that relief is incidental to a final injunctive or declaratory remedy.

Here, defendants argue that the district court should have granted their motion to decertify the class for failure to satisfy Rule 23. First, they argue that the district court's A+B remedy harms some class members, and that the presence of these individuals in the class violates both Rule 23(b)(2) – on the theory that a (b)(2)

class should be decertified if "a 'single injunction or declaratory judgment' cannot provide a benefit 'to each member of the class,'" Appellees' Br. at 22 (quoting *Wal-Mart*, 131 S. Ct. at 2557) – and Rule 23(a)(4), because class representatives who benefit from the A+B remedy have interests adverse to those harmed by it. They next contend that the relief granted by the court violates Rule 23(b)(2) for the additional reasons that "Rule 23(b)(2) does not permit monetary relief that is incidental to *reformation*," and, in any event, "there is nothing 'incidental' about the monetary relief ordered by the district court." Appellees' Br. at 23, 25 (emphasis added).[7] We conclude that the district court did not abuse its discretion in denying defendants' motion to decertify.

i) Defendants Have Not Shown Harm to Class Members

According to the defendants, the district court's A+B remedy will make some class members worse off because they will receive less money from that remedy than from Part B alone. The district court did not make factual findings on this point, likely due to the fact that defendants raised the argument only on remand after Supreme Court review, and only in a post-hearing brief to which plaintiffs did not

---

[7] Defendants also argue that establishing mistake, an element of plaintiffs' reformation claim, requires individualized proof of mistake and cannot be shown on a class-wide basis, rendering decertification appropriate pursuant to Rule 23(a)(2). We take up this argument *infra*.

have an opportunity to respond. *See* Defendants' Post-Hearing Brief in Support of Their Motion To Decertify the Class and in Opposition to Plaintiffs' Requested Relief, *Amara v. CIGNA Corp.*, No. 3:01-cv-02361-JBA (D. Conn. Apr. 16, 2012), ECF No. 362. Nonetheless, Rule 23(c)(1)(C) requires courts to "reassess . . . class rulings as the case develops," *Boucher v. Syracuse*, 164 F.3d 113, 118 (2d Cir. 1999), and to ensure continued compliance with Rule 23's requirements. *See General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982) (deciding that "actual . . . conformance with Rule 23(a) remains . . . indispensable"); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (holding that "the Due Process Clause of course requires that the named plaintiff *at all times* adequately represent the interests of the absent class members"). This obligation is particularly solemn in the Rule 23(b)(2) context because absent class members need not receive notice or an opportunity to opt out. *See Wal-Mart*, 131 S. Ct. at 2559.

Our review of the record does not reveal support for defendants' argument that the A+B remedy will harm class members. Defendants rely on the report and testimony of their actuarial expert, Lawrence Sher, who concluded that some plaintiffs would receive less money under the A+B remedy than under the Part B plan alone. This conclusion is not based on a general sampling of the class members,

however, but only on an examination of "class members who terminated from CIGNA . . . and whose Part B benefits either exceeded or were within 10% of their corresponding Part A and A+B benefits." E-838-39. Thus, and critically, every person Sher considered had already left CIGNA. But under the terms of the district court's remedial order, any employee who has left the company is "entitled to receive the *difference in value* between the full-value of the Part A annuity" and the lump sum he or she has already received under Part B. *Amara IV*, 925 F. Supp. 2d at 265 (emphasis added). In other words, "payback [of received benefits] is not required," and class members who no longer work for CIGNA receive only "additional" benefits to which they are entitled under the A+B remedy. *Amara II*, 559 F. Supp. 2d. at 217; *see Amara IV*, 925 F. Supp. 2d at 265 (adopting the remedy from *Amara II*). As a result, even assuming Sher succeeded in his task of identifying individuals who received more under Part B than they would be entitled under A+B, the structure of the remedy prevents any class member he identified from being worse off.

Furthermore, the record is devoid of evidence that current CIGNA employees will be harmed by the A+B remedy. The A+B remedy is no surprise: the district court awarded identical relief in 2008, but defendants did not raise the problem of

22

harmed class members on appeal or before the Supreme Court. Even now, despite having control over all the relevant employment information, defendants have not identified a single current employee who will be harmed by A+B. *See Johnson*, 702 F.3d at 372 (refusing to rule that a remedy harmed class members when defendant "either didn't look for such a class member, which would be inexcusable, or it looked but didn't find one, which would probably mean that there isn't any such class member"). Sher's report and testimony are of little value on this issue. As described above, Sher only considered employees who have already received benefits from the company. And of the 27 individuals that he pulled from his sample for closer examination, all but one retired before 2002. The one who did retire later – in 2008 – performed *better* under the A+B remedy than under Part B alone. E-887. The plaintiffs' actuarial expert, Claude Poulin, used Sher's data to discuss how one could go about identifying other "individuals for whom A+B or a return to Part A might increase the individual's total benefit *by less than 10%*." E-963-64 (emphasis added). But neither actuary extrapolates Sher's report to provide an explanation for how any current employees could be made worse off by the reformed A+B plan. We therefore find no factual support for defendants' argument

23

that the district court's remedy will harm some class members.[8]

Given this dearth of proof, the district court's decision to deny the motion for decertification does not run afoul of Rules 23(a)(4) or (b)(2). *See Charron v. Weiner*, 731 F.3d 241 (2d Cir. 2013) (finding no violation of Rule 23(a)(4) absent evidence of a "fundamental conflict between class members necessitating separate representation"). Nor does Rule 23(b)(2) require decertification simply because some class members may receive the *same* retirement benefits under A+B as under Part B alone. For one, the district court's remedy still provides these class members some benefit in the form of new notice. *See Amara IV*, 925 F. Supp. 2d at 265. But more importantly, "[i]t is often the case in class litigation that by the time the remedial phase is reached, some of the original plaintiffs will not be entitled to recover." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 808 (7th Cir. 2013); *see also*

---

[8] Defendants also argue that A+B frustrates class members' ability, pursuant to Part B, to take their benefits under the plan (including the lump sum given an undisclosed "haircut" by the defendants and supposedly representing the full value of their Part A accrued benefits) as a lump sum or before they turn 65. But defendants have offered no reason, legal or practical, why any class member seeking a lump sum payment of the whole A+B benefit could not simply convert the Part A portion of the benefit into a lump sum through an ordinary commercial transaction on the open market. Perhaps because there is no bar to such a transaction (or perhaps because no class member values the lump sum and survivorship options enough to give up the greater overall benefit of A+B), not a single member of the certified class has attempted to intervene in order to object either to the class certification or to the relief ordered by the court, on the ground that the court's relief was less advantageous to that employee than Part B.

24

*Walters v. Reno*, 145 F.3d 1032 , 1047 (9th Cir. 1998). *Wal-Mart* did not make all such class actions impermissible. Instead, the decision simply emphasized that in a class action certified under Rule 23(b)(2), "each individual class member" is not "entitled to a *different* injunction." 131 S. Ct. at 2557 (emphasis in original). The district court's A+B remedy complies with that requirement.

ii) The Class Remedy Was Proper Under Rule 23(b)(2)

We similarly reject defendants' claim that, even assuming a benefit to all class members, the district court's reformation remedy and award of monetary damages are simply not permitted under Rule 23(b)(2). This provision authorizes class actions where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Relying principally on the Supreme Court's statement in *Amara III* that "the relief entered [by the district court in *Amara II*], insofar as it does not consist of injunctive relief, closely resembles three other traditional equitable remedies," *Amara III*, 131 S. Ct. at 1879, defendants contend that reformation (one of these three equitable remedies) does not constitute injunctive relief and so cannot support the provision of monetary relief in the form of the A+B remedy. Rule 23(b)(2),

25

defendants argue, "does not permit monetary relief that is incidental to reformation" because reformation is a traditional equitable remedy and "[t]he Rule does not speak of 'equitable' remedies generally but of injunctions and declaratory judgments." Appellees' Br. at 23 (citing *Wal-Mart*, 131 S. Ct. at 2561). For the following reasons, we disagree.

At the start, defendants read their single sentence from *Amara III* shorn of its context. The Supreme Court did not declare in *Amara III* that reformation may not be granted to a Rule 23(b)(2) class because reformation is not injunctive relief. Instead, the Court was simply differentiating between the forms of relief that the district court had ordered in *Amara II*, which the Supreme Court described as involving two steps: first, an order that "the terms of the plan [be] reformed," which the Court ultimately concluded was beyond the scope of § 502(a)(1)(B), and second, an order that the plan administrator "enforce the plan as reformed," which it deemed "consistent with § 502(a)(1)(B)." *Amara III*, 131 S. Ct. at 1876. The passage that defendants quote suggests nothing more than that, to the extent the district court's reformation remedy went beyond the specific form of relief authorized by § 502(a)(1)(B), it might still be permissible pursuant to ERISA's § 502(a)(3). The Supreme Court was not commenting upon Rule 23(b)(2) and did not make a

definitive statement on the availability of reformation under that provision.

By contrast, courts confronting the specific question whether reformation is available to a Rule 23(b)(2) class in the context of ERISA claims have answered that question in the affirmative, and with good reason. As the Seventh Circuit explained in *Johnson*, 702 F.3d 364, reformation in this context is essentially "a declaration of the rights that the plan confers and an injunction ordering [the defendant] to conform the text of the plan to the declaration." *Id.* at 371; *see also Mezyk v. U.S. Bank Pension Plan*, Nos. 3:09-cv-384(JPG)(DGW), 3:10-cv-696(JPG)(DGW), 2011 WL 6729570 (S.D. Ill. Dec. 21, 2011); *cf. Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 427 (6th Cir. 2012) ("Of course, Rule 23(b)(2) certification remains available in other circumstances, including when the plaintiffs seek a declaration about the meaning of a contract."). That reasoning is sound. Historically, reformation is "a way station, a precursor to some other and final remedy." 1 Dan B. Dobbs, *Law of Remedies* § 4.3(7) at 618 (2d ed. 1993); *see* 4 John Norton Pomeroy, *Equity Jurisprudence and Equitable Remedies* § 1375 (1905). Where that "way station" is on the road to injunctive relief, rather than a different equitable remedy like the back pay at issue in *Wal-Mart*, reformation is consistent with Rule 23's requirement that the "*final* injunctive relief" be "appropriate respecting the class as a whole." Fed. R. Civ. P.

27

23(b)(2) (emphasis added); *Wal-Mart*, 131 S. Ct. at 2557 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted . . . .") (internal quotation marks omitted). Here, the Supreme Court has already confirmed that an order requiring defendants to enforce a plan providing A+B benefits is injunctive. *See Amara III*, 131 S. Ct. at 1876. That the district court used reformation as a route to that result does not render the final relief inconsistent with the mandates of Rule 23(b)(2).

The defendants also contend that the monetary relief flowing from such reformation is not incidental to the A+B remedy, rendering a Rule 23(b)(2) class improper. But, this overlooks the fact that, as described above, reformation can be properly understood as a declaration of the plaintiffs' rights under the plan and an injunction ordering the plan to be reformed to reflect that declaration. When the plan is reformed according to the district court's order, monetary benefits flow as a necessary consequence of that injunction. Accordingly, monetary relief is incidental to the A+B remedy.

Further, as defendants acknowledge, the reason that we require monetary relief to arise only incidentally from a defendant's liability to the class as a whole is to "protect[] the legitimate interests of potential class members who might wish to

pursue their monetary claims individually." *Allison*, 151 F.3d at 415; *see* Appellees' Br. at 23. The district court decided that absent class members have no need for such protection in this case because the monetary relief does not depend on "complex individualized determinations" for which litigation specific to each individual could make a difference. *Amara IV*, 925 F. Supp. 2d at 264; *see Allison*, 151 F.3d at 415 (explaining that Rule 23(b)(2) is inappropriate where such determinations are required). We detect no abuse of discretion in that analysis. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 116. The evidentiary hearing on the remedy issue confirmed that the damages due each individual class member after the court enjoins CIGNA to reform the terms of its pension plan are easily "capable of computation by means of objective standards." *Allison*, 151 F.3d at 415. Individual litigation would make no difference because "each individual class member would" not "be entitled to a *different* injunction or declaratory judgment." *See Wal-Mart*, 131 S. Ct. at 2557 (emphasis in original).[9] Instead, this proceeding has "generate[d] common answers apt to drive the resolution of the litigation." *See id.* at 2552 (internal quotation marks omitted; emphasis omitted).

___

[9] Defendants do not oppose this point. Instead, they argue that the purpose of this class action has been to recover money. However, *Wal-Mart* did not direct courts to divine the plaintiffs' motivation for bringing a lawsuit. And in this case, unlike *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218 (2d Cir. 2012), on which the defendants rely, the class seeks prospective injunctive relief and involves members that would benefit from such a decree. *See id.* at 223-24.

**B. Reformation**

Defendants' next set of arguments on appeal – that the district court erred in ordering reformation of the CIGNA Pension Plan to reflect the A+B remedy – relies on two principal contentions: first, that the court erroneously applied contract, rather than trust, principles in reforming the plan; and, second, that even assuming contract principles applied, it erred in concluding that the elements of reformation had been established. We are not persuaded.

i) Contract Principles Were Properly Applied

The defendants argue, first, that the district court erred in reforming the CIGNA Pension Plan in accordance with contract, rather than trust law principles. They propose that the court should have applied trust law and considered the *settlor's* intent when reforming the plan. Since CIGNA, as settlor, was not shown to have "intended to provide A+B, or anything other than the benefits described in the actual Part B plan document," there can be no reformation. Appellees' Br. at 34. For the following reasons, we disagree.

"Retirement plan documents are similar to both trusts and contracts." *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1166 (9th Cir. 2012). In *Amara III*, the Supreme Court did note that ERISA typically treats a plan fiduciary as a trustee and

a retirement plan as a trust. *Amara III*, 131 S. Ct. at 1879. But in discussing the availability of a reformation remedy under § 502(a)(3), the Court exclusively referred to principles of contract law, not trust law. *Id.* at 1879, 1881. That focus is consistent with the Restatement (Third) of Trusts, which explains that trust reformation is dictated by principles of contract law "[w]here consideration is involved in the creation of a trust." *Id.* § 62 cmt. a (2003); *see also id.* § 12 cmt. a (same). And under contract law, when a party induces assent to a writing by fraud or intentional misrepresentation, a court may reform that writing to reflect the terms as represented to the innocent party. *See* Rest. (Second) of Contracts § 166; *see also Nat'l Am. Corp. v. Fed. Rep. of Nigeria*, 597 F.2d 314, 322-23 (2d Cir. 1979) ("[T]he defrauded party . . . should be given the benefit of the expected settlement."); *De Pace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 566-67 (E.D.N.Y. 2003).

We agree with the district court that, because the CIGNA Pension Plan is part of a compensation package for employees that stems from their employment agreements, plaintiffs have given consideration for their participation in the retirement plan so that it is appropriate, to the extent this plan constitutes a trust, to analyze reformation under contract principles.[10] The district court therefore

_____

[10] Defendants confusingly argue that the payment of consideration does not alter the outcome of the reformation analysis by invoking a separate provision of the Restatement.

31

properly reformed the CIGNA plan to reflect the representations that the defendants made to the plaintiffs. Indeed, as the district court observed, defendants have not identified a single pre-merger case showing that a court of equity would have applied the standards of trust reformation to "an analogous trust-contract hybrid, . . . rather than contract reformation." *Amara IV*, 925 F. Supp. 2d at 251. To hold otherwise – and rule that reformation of an ERISA plan is governed solely by the settlor's intent even in cases involving intentional misrepresentations – would produce the unreasonable result that a pension plan could only be reformed when the employer is mistaken about its attributes, but not when employees are deceived.[11]

---

They incorrectly imply that the reason that the payment of consideration alters the requirements for proving reformation is that under common law principles, consideration causes the party providing it to be deemed the trust's settlor. *See* Appellees' Br. at 35; Rest. (Third) of Trusts § 10 cmt. e. They note that this common law rule "has been abrogated by ERISA's specific statutory provisions defining the 'plan sponsor.'" Appellees' Reply Br. at 17. But there is no support for the position that consideration alters the reformation analysis under the common law only because of the doctrine that consideration transforms the identity of the settlor. Moreover, while ERISA does define the plan sponsor, it says nothing regarding the specific requirements necessary to prove reformation under § 502(a)(3) and therefore does not abrogate the common law (as properly understood) on that subject.

[11] None of the parties in this case has ever contended that CIGNA was mistaken about the terms of the new plan. *See, e.g., Amara I*, 534 F. Supp. 2d at 305 ("CIGNA was aware that its Plan could result in wear away . . . ."); *id.* at 343 ("CIGNA was well aware of the true effects on the rate benefit accrual likely to result from the shift to Part B . . . ."). But this is no bar to the A+B remedy. Where consideration is involved in the creation of a trust

ii) Plaintiffs Established the Prerequisites for Reformation

Defendants next argue that the district court erred in concluding that the elements of reformation have been established – in particular, that plaintiffs satisfied their burden of establishing mistake. In applying the standards of contract reformation in the context of ERISA, this Court looks to federal common law rather than any particular state's contract law. *See Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 84 n.5 (2d Cir. 2001) ("[I]n ERISA cases, state law does not control. Instead, general common law principles apply."). A contract may be reformed due to the mutual mistake of both parties, or where one party is mistaken and the other commits fraud or engages in inequitable conduct.[12] *Simmons Creek Coal Co. v. Doran*,

_____

and the settlor induces assent to the trust's terms by fraud or misrepresentation, the reasonable perceptions of the *beneficiaries* determine the nature of the reformation remedy.

[12] Citing the Supreme Court's opinion in *Amara III*, defendants argue that reformation under § 502(a)(3) also requires a showing of "actual harm." Appellees' Br. at 43. But we agree with the district court that this misreads the Supreme Court's opinion. Quite to the contrary, in answering the question that it certified – whether "likely harm" is the appropriate standard for determining whether plaintiffs are entitled to relief – the Court makes clear that "[t]he relevant substantive provisions of ERISA do not set forth *any* particular standard for determining harm." *Amara III*, 131 S. Ct. at 1881 (emphasis added). Instead:

[A]ny requirement of harm must come from the law of equity.

Looking to the law of equity, there is no general principle that 'detrimental reliance' must be proved before a remedy is decreed. To the extent any such requirement arises, it is because the specific remedy being contemplated imposes such a

33

142 U.S. 417, 435 (1892); *see also Amara III*, 131 S. Ct. at 1879 ("The power to reform

contracts . . . is a traditional power of an equity court . . . and was used to prevent

fraud."); 27 Williston on Contracts § 69:55, at 160 (4th ed. 2010) (reformation is

available in a situation where "owing to the fraud of one of the parties and mistake

of the other[, the writing] fails to express the agreement at which they arrived").

Since the parties agree that CIGNA was not mistaken about the terms of the plan,

plaintiffs, to establish that reformation was appropriate, were required to show that

defendants committed fraud or similar inequitable conduct and that such fraud

reasonably caused plaintiffs to be mistaken about the terms of the pension plan. *See*

---

requirement.

*Id.* The Supreme Court goes on to discuss the requirement of actual harm in the context of surcharge, but never does it indicate that reformation requires a showing of actual harm. *Id.* at 1881-82. Defendants cite a decision from the Southern District of New York, *Osberg v. Foot Locker, Inc.*, 907 F. Supp. 2d 527 (S.D.N.Y. 2012), in support of their interpretation that *Amara III* requires actual harm to be proven for reformation, but that portion of the district court's decision has since been vacated by a summary order of this Court, which declared that "the district court erroneously applied an 'actual harm' requirement." *Osberg v. Foot Locker, Inc.*, 555 Fed. App'x 77, 80 (2d Cir. 2014) (summary order). Moreover, reformation *does* require a showing of mutual mistake or mistake coupled with fraud, so that harm (actual or otherwise) flows from the mistaken party's failure to receive its expected agreement. Traditional equitable principles do not require a separate showing of harm for reformation. *See, e.g., Baltzer v. Raleigh & Augusta R. Co.*, 115 U.S. 634, 645 (1885) ("[I]t is well settled that equity would reform the contract, and enforce it, as reformed, if the mistake or fraud were shown."); 1 Dobbs, *Law of Remedies* § 4.3(7) at 617 (2d ed. 1993) ("When parties come to an agreement, but by fraud or mistake write it down in some fashion that does not truly reflect their contract, equity will reform the writing to make it reflect the parties' true intention.").

Rest. (Second) of Contracts § 166. The facts required to satisfy the elements of reformation must be proven by clear and convincing evidence. *See* 2 Dobbs, *Law of Remedies* § 11.6(1) at 743; *Healy v. Rich Products Corp.*, 981 F.2d 68, 73 (2d Cir. 1992).

Based on our review of the record as a whole, we conclude that the district court did not err – much less clearly err – in determining that the plaintiffs established "a basis for [the court] to reform the CIGNA Pension Plan due to CIGNA's fraud paired with Plaintiffs' unilateral mistake." *Amara IV*, 925 F. Supp. 2d at 252. We address the elements at issue in turn.

(a) Fraud

While no "single statement . . . accurately define[s] the equitable conception of fraud," it generally consists of "obtaining an undue advantage by means of some act or omission which is unconscientious or a violation of good faith." 3 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 873 at 420-21 (5th ed. 1941). Here, defendants misrepresented the terms of CIGNA's new pension plan and actively prevented employees from learning the truth about the plan. As Judge Kravitz put it in *Amara I*, "CIGNA employees suffered from the lack of accurate information in CIGNA's disclosures, and CIGNA was aware of this fact." *Amara I*, 534 F. Supp. 2d at 342; *see also id.* at 349 (deciding that CIGNA made "materially misleading

35

statements" about wear away). CIGNA's misbehavior was designed to "ease the transition to a less favorable retirement program." *Id.* at 343. As a result, the district court did not err in finding that defendants obtained undue advantage through these actions by avoiding adverse employee reactions. *See Amara IV*, 925 F. Supp. 2d at 253 (ruling that "CIGNA engaged in fraud or similarly inequitable conduct").

As discussed above, defendants now contend, based on actuarial calculations, that some employees will not benefit or will even be made worse off from the A+B remedy. Because of this, CIGNA argues that its disclosures were accurate with respect to these employees and, accordingly, that there can be no finding of fraud (or mistake) on a class-wide basis. But this logic is flawed. Even assuming defendants have shown that some employees who have already terminated their relationship with the company received a benefit under Part B as large as under the A+B remedy, CIGNA's statements to those employees were still deceptive. Among other things, CIGNA concealed the *possibility* of wear away from its employees and misled them about the conversion of their accrued benefits into the Part B plan. *Amara II*, 559 F. Supp. 2d at 211; *Amara IV*, 925 F. Supp. 2d at 259. Regardless of how benefits actually accrued under plaintiffs' plans, at the time of the conversion to Part B their accrued benefits were at risk of wear away due to fluctuating future interest

36

rates.[13]  By hiding the truth about the plan, CIGNA prevented *all* of its employees

from becoming disaffected, spreading knowledge regarding the plan to others who

stood to lose more from the benefit conversion, and from planning for their

retirement.  Therefore the district court did not err in determining that CIGNA

committed fraud or inequitable conduct against *all* of the class members.

Defendants also argue that any fraud was committed by CIGNA acting in its

capacity as plan administrator, which is not a basis for reformation because ERISA

does not "giv[e] the administrator the power to set plan terms indirectly by

including them in summary plan descriptions."  *Amara III*, 131 S. Ct. at 1877-78

(noting that ERISA "carefully distinguishes" the roles of sponsor and administrator);

*see also id.* at 1884 (Scalia, J., concurring in the judgment) (same).  We agree with the

district court that to deny reformation solely due to the general distinction between

sponsor and administrator in ERISA would be inequitable in the circumstances here,

where CIGNA performed both roles and used that dual position intentionally to

mislead employees about plan terms.[14]  *See Amara IV*, 925 F. Supp. 2d at 254.  It is

---

[13] By contrast, benefits under the A+B remedy are not subject to wear away because the same benefits already earned by the employee (that employee's benefits under Part A) are guaranteed.

[14] Contrary to defendants' claim, this conclusion does not entitle a plan's participants to reformation any time a plan communication contains an error.  First, reformation under

noteworthy, moreover, that the Supreme Court was aware that the misleading summary descriptions of the plan were proffered to employees by CIGNA in its role as plan administrator. *See Amara III*, 131 S. Ct. at 1872-73, 1876. Yet, it still remanded the case for the district court to determine whether the plan (provided to employees by CIGNA as plan sponsor) could be reformed in order to remedy these falsehoods. *Id.* at 1882.

Further, while ERISA generally does draw a distinction between the roles of plan administrator and plan sponsor, § 502(a)(3) can be used to redress harms committed by both types of entities. *See Varity Corp.*, 516 U.S. at 492-505 (affirming § 502(a)(3) relief requiring reinstatement of employees into a plan to redress inequitable conduct by a plan administrator, when the administrator was also the employer); *cf. Retirement Plan of UNITE HERE Nat. Retirement Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 284-85 (2d Cir. 2010) (upholding a finding of liability

---

§ 502(a)(3) is likely unavailable when ERISA offers another adequate remedy. *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) ("[W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'"). Second, this is not a case of mere mistake or error in describing a plan. We need not and do not decide whether a court may properly disregard the distinction between sponsors and administrators when the entities that perform these roles are distinct or when plaintiffs do not make a showing of fraud or inequitable conduct on the part of both.

under §§ 502(a)(3) and 4301(a) for an entity deemed to be the plan sponsor under the 'alter ego' theory).[15] That § 502(a)(3) provides for an *equitable* remedy, moreover, further supports preventing CIGNA from gaining advantage by virtue of its dual roles, since the traditional purpose of equity is to redress wrongful conduct causing harm that would otherwise be uncompensated by a rigid interpretation of the law. *See* 3 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 848 (5th ed. 1941) (noting that "equity will, in general, relieve the one who has . . . been injured" through inequitable conduct). This conclusion is supported by the reasoning of the Third Circuit, which upheld a remedy issued under § 502(a)(3) that affected an entity's actions as plan sponsor even though the remedy was issued in response to actions the entity carried out in its capacity as plan administrator. *See In re Unisys Corp. Retiree Medical Benefits ERISA Litig.*, 579 F.3d 220, 236-37 (3d Cir. 2009). There, the court declared that "the specific equitable relief provision of ERISA . . . trumps the

---

[15] Indeed, *Kombassan* illustrates that the entity on which liability is imposed through § 502(a)(3) need not in all circumstances be the exact same entity committing the acts leading to liability. *See* 629 F.3d at 284-85. There, this Court held Kombassan Holdings A.S. liable for the actions of a separate entity, Hit or Miss ("HOM"), because even though it "assigned its HOM shares to four Turkish corporations . . . , it continued to exercise complete control over HOM." *Id.* at 285. Here, the district court found that CIGNA retained control of the content of the information released by the plan administrator and should therefore "be treated as a *de facto* administrator." *Amara I*, 534 F. Supp. 2d at 330-31; *Amara IV*, 925 F. Supp. 2d at 254.

application of the general principle that ERISA does not regulate settlor activity." *Id.* at 237.

Finally (and contrary to defendants' claim), reforming the CIGNA retirement plan partly in light of the misleading representations made in the SPDs and other plan communications is consistent with the applicable principles of reformation. As described above, under contract law, when a party induces assent to a writing by fraud or intentional misrepresentation, a court may reform that writing to reflect the terms as represented to the innocent party. *See Simmons Creek Coal*, 142 U.S. at 435; Rest. (Second) of Contracts § 166. In *Amara III*, the Supreme Court stated that the documents CIGNA provided summarizing the new plan "do not themselves constitute the *terms* of the plan *for purposes of § 502(a)(1)(B)*." *Id.* at 1878 (first emphasis in original). These documents, however, do "provide communication with beneficiaries *about* the plan." *Id.* (emphasis in original). The district court did not read CIGNA's communications about the plan to be terms of the plan itself. Instead, representations CIGNA made in its capacity as plan administrator constituted evidence of CIGNA's fraud and evidence regarding what CIGNA's employees understood the transition from Part A to Part B to entail. *See Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 818-21 (7th Cir. 2010) (holding that

40

reformation of a plan's terms was appropriate based in part on summaries of the plan given to employees by the plan administrator); *see also Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004) ("There is no doubt about the centrality of ERISA's object of protecting employees' justified expectation of receiving the benefits their employers promise them."). We therefore agree with the district court that, in the circumstances of this case, reforming the CIGNA plan based in part on CIGNA's misleading representations does not impermissibly grant plan administrators "the power to set plan terms." *Amara III*, 131 S. Ct. at 1877.

(b) Mistake

Defendants next contend that the district court erred in concluding that mistake had been shown as to the members of the class. Proving mistake for purposes of granting reformation requires a showing that a party entered a contract "in ignorance or mistake of facts material to its operation." *Ivinson v. Hutton*, 98 U.S. 79, 82 (1878). Defendants argue that determining mistake is "an individualized inquiry that depends on each class member's state of mind and cannot be decided on a classwide basis." Appellees' Br. at 30. But plaintiffs can prove ignorance of a contract's terms through generalized circumstantial evidence in appropriate cases. Such proof may be more than sufficient, moreover, in certain cases where, as here,

defendants have made uniform misrepresentations about an agreement's contents and have undertaken efforts to conceal its effect. *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002); *see In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 118. By way of analogy, in *In re U.S. Foodservice Inc. Pricing Litigation* we held that plaintiffs could establish reliance on a class-wide basis by generalized circumstantial evidence where the defendant had systematically inflated invoices provided to class members who thereafter paid based on the invoices – demonstrating, circumstantially, their reliance on the implicit representation that the stated amounts were honestly owed. *Id.* at 119-20; *see also Klay v. Humana*, 382 F.3d 1241, 1258-59 (11th Cir. 2004) (ruling that, "based on the nature of the misrepresentations at issue," generalized circumstantial evidence "could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' misrepresentations").[16] A similar analysis holds true for the reformation remedy at issue here.

The district court did not clearly err in determining that defendants' misrepresentations about the contents of the retirement plan were uniform, and

---

[16] We note that the Supreme Court later held that reliance need not be proven at all for the type of claim at issue in *Klay*, but this holding did not implicate *Klay*'s logic regarding generalized proof. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008).

helped to establish that the plaintiffs did not know the truth about their retirement benefits. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 118 (applying an abuse of discretion standard). As to uniformity, CIGNA's misrepresentations came in the form of two SPDs, a summary of material modifications, and a 204(h) notice. *Amara I*, 534 F. Supp. 2d at 334. These documents were sent to the entire class and were "essential in informing employees of their rights under employers' pension plans." *Amara I*, 534 F. Supp. 2d at 345.

The district court likewise committed no clear error in finding, based on record evidence, that "employees read the disclosures looking for harmful changes," and that "others expected that they would hear through the office grapevine if the notices disclosed detrimental changes to the benefits." *Amara IV*, 925 F. Supp. 2d at 259. For instance, according to an internal *CIGNA* survey, 92% of those who responded "thoroughly read the retirement communications [they] received" about the switch to Part B. E-416-17; *see Amara III*, 131 S. Ct. at 1881 ("[Employees who did not read CIGNA's communications about the transition between plans] may have thought fellow employees, or informal workplace discussion, would have let them know if, say, plan changes would likely prove harmful."). Moreover, this widespread focus on the plan materials was no surprise to CIGNA. The company

43

was "aware of the significant reduction in the rate of future benefit accrual," *Amara I*, 534 F. Supp. 2d at 344, the fact that a "sizeable group of employees" would suffer from wear away, *id.* at 348, and of complaints from employees at other companies that had switched to defined contribution plans, *id.* at 343. Facing these obstacles to a smooth transition to Part B, CIGNA "sought to negate the risk of backlash by producing affirmatively and materially misleading notices." *Id.* at 344; *see id.* at 343 (quoting internal documents that "highlight CIGNA's desire to '[q]uickly dispel perceptions of take aways' and 'focus on the potential additional benefits'" (internal quotation marks omitted)).

CIGNA's misrepresentations achieved the desired result: defendants have not pointed to evidence that any employee understood the ways in which Part A benefits were reduced as a result of the plan conversion or provided testimony from even a single employee stating that he or she understood that the new plan could cause wear away. *See* Oral Argument, *Amara v. CIGNA Corp.*, No. 3:01-cv-02361-JBA (D. Conn. Nov. 6, 2013), ECF No. 406, at 94-95 ("I expected you to have some witnesses who testified that they knew full well [about the ways in which the new plan could disadvantage them], but we actually had a trial and I didn't hear that from anybody."). We can discern no error, moreover, in the district court's inference

44

that informed employees, aware that their pension benefits were less valuable, would have protested the change, requested a higher salary, filed a lawsuit, or left for another employer. *Amara I*, 534 F. Supp. 2d at 354.

Defendants argue that somehow plaintiffs could not have been mistaken as to their benefits, since they knew the exact balances resulting from the conversion of their Part A benefits into Part B. But the plan terms were confusing and CIGNA intentionally withheld details that would provide employees with a direct comparison of their benefits under Part A with their anticipated benefits under Part B. *See Amara I*, 534 F. Supp. 2d at 341-44. In fact, the district court found that CIGNA specifically instructed its benefits department and consulting company "*not to provide benefits comparisons under the old and new plans,*" *Amara IV*, 925 F. Supp. 2d at 253 (citing *Amara I*, 534 F. Supp. 2d at 343) (emphasis in original), even though employees explicitly requested such a comparison. By doing so – and by affirmatively misrepresenting the effects of the conversion – CIGNA successfully lulled employees, thus avoiding any "notable controversy." *Amara I*, 534 F. Supp. 2d at 343. Indeed, CIGNA reported in an internal memo that "[u]like some employers instituting these plans, we have avoided any significant negative reaction from employees." *Id.* (finding that "in September 1997, several articles began to

appear on cash balance conversions at other companies, and in some cases, complaints by employees resulted in partial or complete rollbacks of the proposed changes"). In all, the evidence before the district court was sufficient to support its conclusion that defendants' misrepresentations led to a class-wide mistake about the terms of the plan.

## D. The District Court's Discretion To Order A+B Benefits

Having concluded that the district court did not abuse its discretion in finding the elements of reformation were met, we now turn to the question whether the A+B remedy ordered by the district court was, as plaintiffs contend, an abuse of discretion.

Plaintiffs argue that the district court should have granted plan beneficiaries the benefits that they were due under the original Part A plan rather than ordering the A+B remedy. They state that the district court did not take into account the Supreme Court's GVR Order when the district court, on remand, declined to grant any "relief broader than that which was previously ordered." Appellants' Br. at 24 (citing *Amara IV*, 925 F. Supp. 2d at 265). Plaintiffs argue that the district court's adoption of Judge Kravitz's reasoning regarding the appropriate remedy was error because it did not "offer a reasoned consideration of the equitable factors in the

46

intervening decision that favor relief" and because its finding was "necessarily rejected by an appellate court's reasoning." Appellants' Br. at 25 (citing *United States v. Minicone*, 994 F.2d 86, 89 (2d Cir. 1993)). We are not persuaded that the district court failed to explain its reasoning to the extent required by law or that it exceeded its discretion.

Nothing in the Supreme Court's GVR Order required the district court to order relief beyond the A+B remedy originally granted by Judge Kravitz. The Supreme Court may issue a GVR Order where it has reason to believe that the original order rests upon a "premise that the lower court would reject if given the opportunity for further consideration." *Lawrence on Behalf of Lawrence v. Chater*, 516 U.S. 163, 167 (1996). But matters remanded in this manner, when they are otherwise within the court's discretion, "require only further consideration." *Id.* at 168. Here, the primary reason that the Supreme Court issued the GVR Order was simply that it had already remanded the case to correct the district court's erroneous impression that relief was unavailable under § 502(a)(3). *See GVR Order*, 131 S. Ct. at 2900 ("The Court vacated the judgment below in *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011). Therefore, the petition for writ of certiorari is granted, and the case is remanded . . . ."). The district court has now ordered relief under § 502(a)(3). Yet, it is

47

permissible for the district court to reason that the logic of Judge Kravitz's prior decision nevertheless supports granting the same remedy despite the fact that relief is now being granted under a new provision.

In the district court's opinion on remand, Judge Arterton states that "Judge Kravitz's prior remedies opinion, although finding its authority in § 502(a)(1)(B) rather than § 502(a)(3), was the result of careful calibration of the interests at stake." *Amara IV*, 925 F. Supp. 2d at 265 (citing *Amara II*, 559 F. Supp. 2d at 206-23). She thereby incorporated Judge Kravitz's equitable analysis, which in turn incorporated the facts found in his prior opinion. *See Amara II*, 559 F. Supp. 2d at 195. While Judge Kravitz considered facts and factors in the context of granting a remedy under § 502(a)(1)(B), his analysis still contains many conclusions and observations that provide equal support for applying the A+B remedy granted under § 502(a)(3) rather than a remedy of returning to Part A. For example, among other things, Judge Kravitz found the following:

- "The one thing that is absolutely clear from CIGNA's communications with its employees is that (with the exception of grandfathered employees) all CIGNA employees would stop receiving benefits under Part A as of December 31, 1997." *Amara II*, 559 F. Supp. 2d at 208.

48

"[N]o one disputes . . . that CIGNA employees understood that Part A was being frozen." *Id.* at 207.

• "[T]he terms of Part B themselves are legally valid under ERISA and CIGNA provided substantial accurate information to its employees regarding, for example, the method by which they would accumulate pay and interest credits." *Id.* at 209.

• Transferring all employees from Part B back to Part A would be difficult, complicated, and time consuming, delaying plan implementation. *See id.* at 209.

• Plan participants had a "reasonable expectation . . . that Part B would protect *all* Part A benefits, including early retirement benefits . . . and that Part B benefits would begin accruing immediately." *Id.* at 211 (emphasis in original).

These observations provided ample support for Judge Arterton's conclusion that an A+B remedy was more appropriate than a return to Part A. The beneficiaries of the CIGNA Pension Plan clearly understood that the plan would be changing, but believed that under the new plan all of their benefits accrued under Part A would be protected. The A+B remedy reforms the contract according to that

understanding, whereas a return to Part A would ignore the fact that beneficiaries clearly understood that going forward they would earn benefits under the new Part B scheme. Further, the analysis Judge Arterton incorporated into her opinion made clear that a return to Part A would involve a much greater degree of administrative difficulty than imposing the new A+B remedy, which could complicate beneficiaries' efforts to receive their benefits. Because the analysis incorporated by Judge Arterton justifies the A+B remedy, she did not abuse her remedial discretion in ordering a remedy that continued to conform to the A+B formula.

Having concluded that the district court did not abuse its discretion in reforming the plan to grant the A+B remedy, we need not address whether relief would alternatively have been proper pursuant to different equitable remedies such as surcharge or estoppel.

## CONCLUSION

We have considered the parties' remaining arguments and have concluded that they are either waived or without merit. For the reasons discussed above, we **AFFIRM** the December 20, 2012 decision of the district court.